2014 VT 38

### In re D.S., Juvenile

### In re M.H., Juvenile

[97 A.3d 882]

Nos. 13-311 & 13-312

Present: **Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.**

Opinion Filed April 25, 2014

*Michael Rose*, St. Albans, for Appellant (13-311).

*Matthew F. Valerio*, Defender General, and *Marshall Pahl*, Appellate Defender, Montpelier, for Appellant (13-312).

*William H. Sorrell*, Attorney General, and *Martha E. Csala*, Assistant Attorney General, Montpelier, for Appellee.

¶ 1. **Reiber, C.J.** Mark, the father of D.S., and Todd, the father of M.H., appeal from the trial court's order terminating their residual parental rights.[*] We affirm the court's decision.

¶ 2. D.S. was born in December 2007. M.H. was born in May 2009. The children share the same mother. Both fathers have extensive criminal records and have been incarcerated for most of their children's lives.

¶ 3. The Department for Children and Families (DCF) became involved with the family in December 2008 based on concerns of substance abuse, sexualized behavior, domestic violence, and neglect. DCF opened a case and began working with mother to

---

[*] For the sake of convenience and clarity, we refer to each father by his first name.

address these and other issues. In January 2012, the children were taken into custody pursuant to an emergency care order. Shortly thereafter, the court issued a temporary care order continuing DCF custody. At the time, both fathers were incarcerated and facing numerous criminal charges.

¶ 4. In July 2012, mother stipulated that the children were in need of care or supervision. An amended disposition report provided a concurrent goal of reunification with mother and adoption. All parties, including the fathers, agreed to this plan at the disposition hearing. DCF subsequently moved to terminate parents' rights. Shortly thereafter, Todd filed a motion to transfer custody of both children to his mother. Following a hearing, the court denied this motion, and it terminated both fathers' rights. Mother voluntarily relinquished her parental rights.

¶ 5. The court made the following findings. Mark was in federal prison when D.S. was born. His criminal record reflects six felony convictions, twenty-four misdemeanor convictions, and twenty-one violation-of-probation complaints. His crimes include domestic assault, grand larceny, numerous convictions for driving under the influence (DUI), and possession of marijuana. In January/February 2012, Mark returned to jail pending charges for sexual assault on a victim less than sixteen years of age, furnishing alcohol to minors, and lewd and lascivious conduct with a child. He also had pending charges for DUI, fourth offense, and operating a vehicle without the owner's consent, stemming from a September 2011 auto accident. He was in jail at the time of the June 2013 termination hearing.

¶ 6. Mark has a significant temper problem when drinking, and he had been prescribed Xanax to help with his anger problem. Mark preferred to illegally smoke marijuana instead of taking Xanax because Xanax made him drowsy and he believed that marijuana better helped him with his anger and anxiety. The court expressed significant concern that Mark would not take his medication to control his anger in the future. It noted that Mark had served federal jail time for a drug conviction involving marijuana. He also had numerous DUI convictions.

¶ 7. At the time of the termination hearing, Mark had not seen D.S. for over eighteen months. Due to court-ordered conditions, he had not had any contact with D.S. during this period. Mark had never been the primary caretaker for D.S. He first saw D.S. when she was two or three years old and had sporadic visits with

her. The longest period of time that Mark had parent-child contact was in 2010 for a period of four-to-five months. Mark had little understanding of the trauma that D.S. suffered while living with mother. He believed that if he took custody of D.S. upon his release from prison, she would be "a happy kid." The court found this belief belied by the evidence. The court also noted that Mark has four other children, many of whom he had not seen for years.

¶ 8. Todd also has an extensive criminal history. He was incarcerated when M.H. was six months old. His record includes at least seven felony convictions and thirty-two misdemeanor convictions. His crimes include assaults, thefts, violations of abuse prevention orders, unlawful restraints, and two convictions for domestic assault with two different victims. Todd was incarcerated in December 2009 following an altercation with M.H.'s mother. At the time, mother said that Todd assaulted her while she was holding M.H. Todd was later released from prison but was incarcerated shortly thereafter, and he has remained incarcerated ever since.

¶ 9. During the first year that M.H. was in DCF custody, Todd did not contact DCF regarding her well-being. When Todd moved to a Vermont prison in December 2012, he contacted DCF and asked that M.H. visit him in jail. The DCF social worker did not believe such visitation was in M.H.'s best interest. At the time, M.H. was being transitioned back to a foster home after being in the Lund Family Center with mother, and there was another planned transition from that foster home to a preadoptive home.

¶ 10. In March 2013, DCF began attempting to arrange a jail visit between Todd and M.H. No visit had occurred by the time of the termination hearing. Todd last saw M.H. and D.S. two years before the termination hearing when his mother brought the children to jail to visit him. Todd believes he is the "psychological father" of D.S. He indicated that he cared for D.S. during her first year of life, including taking her to doctor's visits. The court observed that Todd had made all phone calls provided for by court order and both children looked forward to talking with him. While incarcerated, Todd also took advantage of programming provided by the Department of Corrections. He attended the Circle of Parents Support Group, a Prevent Child Abuse presentation on shaken baby syndrome, and a food and nutrition education program.

¶ 11. As noted, Todd proposed that the children be placed with his mother until he could care for them following his release from prison. The court found that it was not in the children's best interests to be placed with grandmother. It explained that both of grandmother's children had significant difficulties following the rules of society. At least seven of her eleven grandchildren had been involved with DCF. Additionally, grandmother allowed her son-in-law, a convicted sex offender, to be at her home and to have contact with D.S. and M.H. When asked about this by DCF, grandmother said that she did not know this was an issue. The court did not credit her assertion that she did not know that her son-in-law was a convicted sex offender and that he could not safely be around children. The court found that grandmother had adopted her son-in-law's daughter, she knew of his criminal convictions, and she knew that his conditions of probation prohibited him from being around children under sixteen. The court noted that grandmother had filed a relief-from-abuse complaint against her son-in-law on behalf of her son-in-law's daughter. Grandmother had also allowed M.H. to have unsupervised contact with another individual, despite specific instructions from DCF not to allow such contact. Additionally, grandmother allowed contact between Todd and the children while the children were attending their daycare programs, unbeknownst to the DCF social worker. This made it difficult for the social worker to monitor the children's behaviors and to understand why certain behaviors were occurring.

¶ 12. The court found that for most of their lives, the children had been exposed to instability, yelling, screaming, and violence. They had moved at least ten times while living with mother and had multiple transitions to new homes after coming into DCF custody. The court found that it was not in the children's best interests to subject them to additional instability by removing them from their present foster parents, who are members of D.S.'s family and were prepared to adopt the children.

¶ 13. The children's foster parents are Mark's sister and her partner. The court found that the children had shown great improvement since moving to this home. The girls no longer displayed aggressive behavior toward one another, and D.S. no longer engaged in sexualized behavior. The children had also stopped using profane and vulgar language. The court found that the foster parents were meeting the children's needs, and that

they provided the girls with needed structure, routine and predictability. The children were thriving as a result. The foster parents loved the girls and were committed to adopting them if they were freed for adoption. As indicated above, the court found that it would be a step backward for the children to have to leave their foster home at this point.

¶ 14. Based on these and other findings, the court concluded that there had been a substantial change in material circumstances because mother, who was the subject of the reunification efforts, had voluntarily relinquished her parental rights. The court also found a substantial change in circumstances due to fathers' stagnation. It explained that both fathers had been incarcerated for significant periods of their children's lives, and they both remained incarcerated at the time of the hearing. While it was possible that either father could be released shortly, given the circumstances described above, neither had made any progress toward being able to begin (not resume) parenting their children in a reasonable period of time. The fathers were not out in society available to parent their children nor had they worked to gain the skills to do so. The young children needed permanency now.

¶ 15. The court next considered whether termination of fathers' rights was in the children's best interests. In doing so, it evaluated the factors set forth by statute. See 33 V.S.A. § 5114. It found that Mark had no interaction or interrelationship with D.S. due to a court order that prevented contact. Prior to that court order, Mark spent only about four months out of his five-year-old child's life having any kind of consistent contact. While D.S. knew who her father was, she did not have a significant relationship with him. M.H. had had more of relationship with her father Todd in recent months. In December 2012, Todd asked for visits with M.H., and he had consistently telephoned her and sent her cards and letters. Todd had been incarcerated, however, almost all of M.H.'s life. Considering the children's relationships with their foster parents, and their adjustments to their homes, 33 V.S.A. § 5114(a)(1), (2), the court found that the children had strong loving relationships with their foster parents, and the foster parents were meeting the children's basic and special needs. Additionally, it found the children fortunate to be placed together. The children were well adjusted to their foster home and thriving on the structure and stability they were receiving there.

¶ 16. As to the most important statutory best-interest factor, the court found that neither father could assume parental duties at

the time of the hearing or within a reasonable period of time. Both remained incarcerated with pending charges. While both expressed optimism that their charges would be dismissed, given their significant criminal histories, there remained a very real concern that they would not be able to stay out of jail and find stable homes and employment. Both also had significant work to do in addressing issues such as anger management, substance abuse, and domestic violence. The court found that a reasonable period of time had already passed for these young children. The children had been subjected to violence, substance abuse and instability throughout their young lives. They required structure and stability now so that they could continue to grow and thrive.

¶ 17. The court further found that neither father played a constructive role in his child's life. The fathers had been absent for much of their children's lives, and when they were present, the fathers exposed the children to instability, violence, and substance abuse. Thus, weighing all of the statutory best interest factors, the court found that DCF had established by clear and convincing evidence that the children's best interests required that their fathers' rights be terminated.

¶ 18. Finally, the court denied Todd's motion to transfer custody and guardianship of the children to his mother, reiterating that it was not in the children's best interests. Although grandmother had a relationship with M.H. and D.S., the court found it in the children's best interests to remain in their foster home, where they were doing exceptionally well and their needs were being met. To disrupt that now, the court concluded, given the children's trauma and young age, would be detrimental to their well-being and clearly against their best interests. Both fathers appealed from the court's order.

¶ 19. We begin with Mark's argument. Mark asserts that the court's decision was based in material part on a factor beyond his control. Specifically, he maintains that he could not contact D.S. for eighteen months pursuant to a court order. According to Mark, it is therefore not his fault that he did not have a significant relationship with D.S. or that he failed to play a constructive role in her life.

¶ 20. ▮ This argument is without merit. First, Mark is solely responsible for the criminal behavior that led to his incarceration and to the imposition of conditions limiting his contact with D.S.

See *In re K.F.*, 2004 VT 40, ¶ 12, 176 Vt. 636, 852 A.2d 584 (mem.) (rejecting father's argument that court's termination decision was based on factors beyond father's control, and stating that "father bears sole responsibility for his frequent incarceration, his failure to maintain consistent contact with [DCF], and his lack of a bond" with his child). Moreover, the court's decision did not focus solely on the eighteen-month period in which father had no contact with D.S. As set forth above, the court found that Mark was never the primary caretaker for D.S. He was incarcerated when D.S. was born, and saw D.S. sporadically beginning when she was two or three years old. Mark's longest period of contact with D.S. was four to five months in 2010. Mark similarly has had little contact with his other four children. When Mark did have contact with D.S., the court found that he exposed her to instability, violence, and substance abuse. Mark does not challenge any of these findings on appeal. The court's findings concerning Mark's relationship with D.S. are well supported by the record, and they are in no way based on factors outside Mark's control.

¶ 21. We turn next to Todd's arguments. Todd first asserts that the court failed to appropriately assess the likelihood that he would be able to resume (or begin, as the court found) parenting M.H. within a reasonable period of time. Citing *In re B.M.*, 165 Vt. 331, 337, 682 A.2d 477, 480 (1996), Todd maintains that the court's analysis was not forward-looking, and the court erroneously concluded that a "reasonable period of time" for reunification had already passed. Todd also argues that the court made no findings to support its conclusion on this point.

¶ 22. ■ ■ These arguments are without merit. As we have explained, to determine a child's best interests, the court must consider four statutory factors. See 33 V.S.A. § 5114. The most important factor in the court's analysis is the likelihood that the natural parent can resume his or her parental duties within a reasonable period of time. *In re B.M.*, 165 Vt. at 336, 682 A.2d at 480. "The reasonableness of the time period is measured from the perspective of the child's needs, and may take account of the child's young age or special needs." *In re C.P.*, 2012 VT 100, ¶ 30, 193 Vt. 29, 71 A.3d 1142 (citations omitted). The court's inquiry must be "forward-looking," that is, the court must consider a parent's "prospective ability to parent the child." *In re B.M.*, 165 Vt. at 337, 682 A.2d at 480. Of course, past events are relevant in this analysis. *Id.* "As long as the court applied the proper

standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." *In re G.S.*, 153 Vt. 651, 652, 572 A.2d 1350, 1351 (1990) (mem.). "We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." *In re A.F.*, 160 Vt. 175, 178, 624 A.2d 867, 869 (1993).

¶ 23. ▉ This is not a case, as Todd suggests, where the court "beg[ged] the question" before it "by concluding that a reasonable period of time ended years before the termination-of-parental-rights hearing." *In re B.M.*, 165 Vt. at 337, 682 A.2d at 480. It is evident that the court engaged in a forward-looking analysis, even if its choice of words suggested otherwise, and the court's conclusion that Todd cannot parent M.H. within a reasonable period of time is amply supported by the court's findings. As set forth above, M.H. is a young child who had been exposed to instability, screaming, violence, and substance abuse for almost all of her life. Given her age and her traumatic past, she was in great need of stability and permanence. Father has been incarcerated for most of M.H.'s life due to his own voluntary choices. During the times that he was not incarcerated, Todd exposed M.H. to instability, violence, and substance abuse. Todd has an extensive criminal history, including two domestic-assault convictions, and the court expressed its well-founded concern that, given his history, Todd was unlikely to stay out of jail or secure any stable housing or employment. The court also found that Todd had significant work to do in addressing his domestic-violence issues, among other issues. The court clearly considered Todd's present ability to parent. Under the circumstances recounted above, the court reasonably concluded that M.H. could not wait any longer for Todd to learn how to parent upon his release from prison.

¶ 24. Todd next argues that the court impermissibly based its decision on the fact that he was incarcerated for most of M.H.'s life. He suggests that the court failed to evaluate his capacity to parent M.H. and D.S. and instead simply wrote him off as "absent." In support of his position, he relies on cases from other jurisdictions involving incarcerated parents. Todd recites his view of the evidence, and essentially asserts that he was doing the best he could under the circumstances.

¶ 25. ▉ ▉ These arguments are equally without merit. The trial court thoroughly considered Todd's capacity to parent as

reflected in the lengthy findings recited above. It applied the appropriate legal standard and it did not rely on a presumption in reaching its conclusion. See *In re D.C.*, 2012 VT 108, ¶ 22, 193 Vt. 101, 71 A.3d 1191 (recognizing that U.S. Supreme Court in *Santosky v. Kramer*, 455 U.S. 745 (1982), did not dictate how states should measure parental unfitness, but rather held that "whatever measure of 'unfitness' a state requires to terminate parental rights must be shown by clear and convincing evidence"). Our law does not require, as Todd posits, that the court "go beyond measures typically used in evaluating the fitness of a non-incarcerated parent." Instead, Vermont law requires the court to measure the "fitness" of any parent by considering four statutory best-interest factors. *Id.* As we have explained,

> [t]hese criteria do not attempt to determine whether a parent is a "good" person or is generally fit to parent any child; rather, the critical question in a termination proceeding is whether the parent is fit, or will be fit within a reasonable period of time, to parent the particular child who is the subject of the termination proceeding.

*Id.* In other words, the question is not whether Todd has been "doing his best under the circumstances," but whether termination of his rights was in M.H.'s best interests as defined by 33 V.S.A. § 5114.

¶ 26. █ The fact of father's incarceration is a proper consideration in the court's analysis of father's fitness pursuant to the statutory standard. As previously stated, our case law makes clear that a parent is responsible for the behavior that leads to incarceration and for the consequences that come with such incarceration. See, e.g., *In re B.M.*, 165 Vt. at 337, 340-42, 682 A.2d at 480, 482-83 (recognizing that father's past circumstances, including his incarceration, had affected parent-child relationship and were relevant to whether father could resume a caregiving role); see also *In re K.F.*, 2004 VT 40, ¶ 12 (affirming termination of father's rights where father had not been available as a parental resource to child for eleven months, and he continued to be unavailable due to his incarceration). The fact that Todd has been incarcerated for most of M.H.'s life is certainly relevant in assessing his relationship with M.H., his ability to parent M.H., and whether he has played a constructive role in her life, and

Todd's incarceration has a direct impact on his availability as a parental resource to M.H. In reaching its decision, the court recognized that, while incarcerated, Todd had made all phone calls provided for by court order. He had also taken advantage of programming provided by the Department of Corrections, including attending a presentation on shaken baby syndrome and a program about food and nutrition. He had been baptized as well. According to Todd, the evidence suggests that he availed himself of every opportunity to prepare himself to parent the children. While Todd believes the evidence shows that he is capable of parenting M.H., the court concluded otherwise, and its decision is well supported by the record.

¶ 27. None of the cases cited by Todd persuade us to reach a contrary conclusion. First, the cases involve different statutory standards than the standard applicable in Vermont. Additionally, many, if not most, of the cases address whether a parent's incarceration, in and of itself, constitutes "abandonment" for purposes of adoption or termination proceedings. See, e.g., *In re B.W.*, 498 So. 2d 946, 947 (Fla. 1986) (considering whether father, who was incarcerated, had "abandoned" his children as defined by state law, and concluding that incarceration does not, as matter of law, constitute abandonment); *Murphy v. Vanderver*, 349 N.E.2d 202, 203 (Ind. Ct. App. 1976) (holding that imprisonment alone does not establish, as a matter of law, abandonment or desertion under state law so as to allow an adoption without that parent's consent); *In re Daniel C.*, 480 A.2d 766, 768-69 (Me. 1984) (rejecting notion that incarceration in and of itself constitutes abandonment of child, but finding sufficient evidence that father, who was repeatedly incarcerated, had willfully abandoned child and that the circumstances were unlikely to change in a reasonable time); *In re Staat*, 178 N.W.2d 709, 712-13 (Minn. 1970) (concluding that imprisonment per se is not sufficient to constitute abandonment). Todd relies on language that relates to a "willful abandonment" analysis. It is in this context, for example, that the Maine court stated that trial courts should "focus, not upon the usual parental responsibility for physical care and support of a child, but upon the parent's responsibility to provide a nurturing parental relationship." *Daniel C.*, 480 A.2d at 769; see also *In re Cody T.*, 2009 ME 95, ¶ 28, 979 A.2d 81 (quoting *Daniel C.*, 480 A.2d at 769). Of course, that court also recognized that "[t]he fact of separation . . . cannot be ignored," and ultimately concluded

that the incarcerated parent had willfully abandoned his child. *Daniel C.*, 480 A.2d at 769. In any event, an evaluation of whether a parent has "willfully abandoned" a child is not similar to an evaluation of the best-interest criteria applicable here.

¶ 28. ■ As suggested above, even those courts that hold that incarceration alone does not, as a matter of law, constitute abandonment recognize that incarceration is a relevant factor in determining if abandonment has occurred. See, e.g., *W.T.J. v E.W.R.*, 721 So. 2d 723, 725 (Fla. 1998) (stating that "[i]ncarceration is a fact which a trial court may consider together with other facts to determine whether clear and convincing evidence of abandonment exists," and concluding that father's commission of violent crime during mother's pregnancy, the foreseeable consequence of which was lengthy term of imprisonment, was relevant and egregious conduct that could support finding of abandonment); *Staat*, 178 N.W.2d at 713 (explaining that fact of imprisonment may combine with other factors, such as parental neglect and withholding of parental affection, so as to lend support to abandonment finding).

¶ 29. ■ To the extent they are relevant, given the different statutory language at issue and the focus on "abandonment" as opposed to other measurements of parental fitness, these cases at best stand for the proposition that the fact that a parent is incarcerated, standing alone, does not per se render that parent unfit. Todd suggests that the court here relied solely on the fact that he was incarcerated in reaching its decision. The record does not support this argument. As set forth above, the court properly evaluated the effect of Todd's incarceration with respect to the statutory best-interest factors. The court also considered Todd's conduct when he was not incarcerated, as well as his prospective ability to begin parenting M.H. The court did not err in its analysis.

¶ 30. Finally, Todd argues that the court made erroneous findings that his mother knew that her son-in-law was a sex offender. He maintains that the court's findings rest on a "flawed interpretation" of the trial testimony. In a related vein, Todd argues that the court erred by refusing to consider placement or custody with his mother as an alternative to termination. He suggests that the court failed to properly evaluate whether placement with her was in the children's best interests and

complains that the court did not construe the juvenile statutes to preserve familial relationships.

¶ 31. ■ ■ These arguments are without merit. First, to the extent that Todd suggests otherwise, we emphasize that the termination of Todd's parental rights is not dependent on the children's placement options. See *In re S.B.*, 174 Vt. 427, 428, 800 A.2d 476, 478 (2002) (mem.) (explaining that a termination proceeding "is not a custody case" in which the court must balance the respective advantages of different placement options, but rather "a legislatively created . . . proceeding in which the court is required to weigh specified statutory factors when determining whether to grant a petition for termination of residual parental rights"); see also *In re S.W.*, 2008 VT 38, ¶ 13, 183 Vt. 610, 949 A.2d 442 (mem.) (rejecting father's argument that court erred in terminating his parental rights because court failed to make findings as to his recommended kinship placements; question before court is whether children's best interests warranted termination of father's rights, not on an evaluation of potential parental fitness of father's relatives). In any event, as indicated above, the court did consider whether placement with Todd's mother was appropriate. It concluded that such placement was not in the children's best interests, and that their best interests were instead served by remaining in their preadoptive home, another kinship placement. In reaching its decision, the court did not "ignore[ ] the rule that the [juvenile] statutes should be construed to preserve familial relationships." As Todd recognizes, the court is not obligated to "preserve the family" at the expense of a child's best interests. In any event, we note that the children here were placed with a relative, Mark's sister. The fact that Todd would have preferred placement with his mother does not demonstrate error.

¶ 32. ■ The court set forth numerous findings in support of its conclusion that placement with grandmother was not in the children's best interests, and these findings are supported by the record. This includes the court's findings that grandmother allowed the children to have contact with her son-in-law even though she knew that he was a sex offender. The court could properly reject grandmother's contrary testimony as incredible given that she had adopted her son-in-law's infant daughter and had also filled out a relief-from-abuse order against her son-in-law

on the infant's behalf. We note that the court identified numerous other reasons why grandmother was not an appropriate placement, none of which Todd challenges on appeal. We find no error in the court's decision.

*Affirmed.*