*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2014-114

JULY TERM, 2014

| | |
|---|---|
| In re K.B., Juvenile | } APPEALED FROM: |
| | } |
| | } Superior Court, Chittenden Unit, |
| . | } Family Division |
| | } |
| | } DOCKET NO. 63-2-11 Cnjv |

Trial Judge: Kevin W. Griffin

In the above-entitled cause, the Clerk will enter:

Mother and Father separately appeal the superior court's order terminating their parental rights with respect to their son, K.B. We affirm.

Neither mother nor father challenges any of the superior court's findings, which reveal the following facts. Prior to K.B.'s birth, the Department for Children and Families (DCF) had become involved with mother in connection with K.B.'s half-sister, born January 19, 2009, because of mother's severe opiate addiction. Eventually, parental rights and responsibilities of the half-sister were awarded to her biological father because of mother's failure to comply with DCF's plan of services. Mother has a criminal history dating back to 2006. In July 2010, she pled guilty to six misdemeanor charges and received an aggregate sentence of six-to-twelve months, all suspended except fifty days. The main focus of her rehabilitative programming has been substance-abuse treatment. Father has a criminal history dating back to 2005, including convictions for aggravated domestic assault, domestic assault, violation of an abuse-prevention order, unlawful trespass of an occupied building, petty larceny, possession of stolen property, and multiple violations of conditions of release.

K.B. was born on February 15, 2011 at a time when mother was homeless and staying with friends on a temporary basis. Three days after K.B.'s birth, as a result of mother's homelessness and her failure to comply with the case plan concerning K.B.'s half-sister, DCF filed a petition alleging that K.B. was a child in need of care or supervision (CHINS). At an emergency hearing, the superior court approved a conditional custody order allowing mother to retain legal custody subject to certain conditions, including that she discuss with DCF participating in a residential treatment program with K.B. at the Lund Family Center. At the time of the hearing, father had a pending criminal case in which he was accused of aggravated domestic assault against mother.

In March 2011, DCF filed a request for an emergency hearing when it learned that mother had not secured suitable housing and was believed to be homeless with K.B. At the hearing, the court denied DCF's request that it be given custody of K.B., but instead issued

another conditional custody order allowing mother to retain custody subject to the condition that she interview at the Lund Center and participate in a residential program there if accepted. Although mother completed an interview with the Center and was accepted for a two-to-four-week residential program, she elected not to participate in the program and instead began living at a shelter with K.B.

Following the emergency hearing, mother admitted on March 29, 2011 that K.B. was CHINS because of her ongoing homelessness and drug addiction and her noncompliance with the case plan concerning K.B.'s half-sister. A disposition hearing was held on June 21, 2011, at which time father's paternity was established. The court's disposition order allowed mother to retain custody of K.B. conditioned upon her complying with the case plan, which required her to complete a parent education course, continue with substance abuse and anger management counseling, maintain stable housing, abide by probation conditions, and execute releases for DCF to monitor compliance with the case plan. Father was permitted parent-child contact and was ordered to complete a parent education course, participate in a substance-abuse evaluation, engage in anger management counseling, secure appropriate housing, remain employed, sign relevant releases, and maintain consistent parent-child contact with K.B. In July 2011, father pled guilty to aggravated domestic assault and received a one-to-three-year sentence, all suspended, except for twelve days on a pre-approved furlough.

At an August 30, 2011 post-disposition review hearing, father asked that mother be held in contempt for not following the court's parent-child contact schedule. During that period, mother had moved multiple times to different motels without notifying DCF, and she had tested positive twice for amphetamines. In response to father's motion for contempt, the court issued an order requiring the parties to comply with the parent-child contact order. Father had supervised visits with K.B. on September 14 and 21, 2011, but the following five scheduled visits did not take place. Mother was responsible for four of the five missed visits. Father filed additional motions for contempt. Following a hearing in December, the court denied those motions, stating that father had not established that mother was in contempt of the court's orders.

In January 2012, mother lost the housing she had obtained through a shelter program. In April 2012, she advised her social worker that she had relapsed and was using illegal drugs again. Arrangements were made to have mother enter a residential treatment program but she was discharged after six days for rule violations. K.B's maternal great-grandmother had agreed to care for K.B. while mother was in residential drug treatment, but after mother failed to complete the program, DCF sought an emergency hearing, which was held on July 27, 2012. Following the hearing, mother entered into another residential treatment program, but was discharged three days later. When K.B.'s maternal grandmother informed DCF that she could no longer care for K.B., DCF requested another emergency hearing, after which custody of K.B. was transferred to DCF, and the child was placed in a legal-risk foster home. Father had not been in contact with DCF since the December 2011 hearing. Shortly thereafter, mother was incarcerated after another relapse.

On November 26, 2012, the court approved a modified disposition case plan that called for concurrent goals of adoption or reunification with mother or father. In December 2012, mother was furloughed to another residential program focusing on substance-abuse treatment. She completed the program and was released in March 2013. Because K.B.'s then-current foster

parents were not willing to adopt the child, DCF decided to focus, one final time, on reunification with mother. DCF urged mother to apply to the Lund Center, where she could participate in a residential treatment program with K.B., but mother declined to do so. Due to mother's refusal to consider that program and her inability to maintain sobriety on a long-term basis, DCF moved K.B. to a pre-adoptive home in April 2013. K.B. has remained in that home since then.

At the time of the May 6, 2013 post-disposition review hearing, mother had participated in a parenting program and, for the most part, was compliant with the Department of Correction's supervision. DCF still had not heard from father since December 2011. At the next post-disposition review hearing held on July 22, 2013, DCF filed an updated case plan calling for adoption of K.B. Despite mother's recent progress in certain programs, housing continued to be a problem, and DCF was concerned that mother would not be able to maintain her recovery. Given's mother's decision not to participate in the Lund Center program, DCF decided to focus on K.B.'s permanency.

On July 24, 2013, DCF filed a petition to terminate mother's and father's parental rights. Shortly thereafter, mother entered the Brattleboro Retreat after suffering what she described as a mental breakdown, which she attributed to a break-up with her partner. Five days later, after she was released from the Retreat, mother was incarcerated for lack of housing, which was a furlough requirement. Mother was released from the correctional facility on two occasions in late September 2013 and early October 2013, only to be returned to jail again after failing drug tests. She remained incarcerated until she completed her maximum sentence on December 30, 2013.

At the time of the two-day termination hearing held in January 2014, mother was living with her uncle and looking for work. She was not taking medication and was not in treatment due to transportation problems. She acknowledged that she could not provide for K.B.'s reasonable needs. Father appeared at the termination hearing. He admitted being absent from K.B.'s life since December 20, 2011, after becoming discouraged with problems surrounding the visitation schedule. Following a period of homelessness, he was living with his girlfriend and her fourteen-month-old son. He had been working at a restaurant and, after a lengthy period of noncompliance with probation conditions, was enrolled in anger management counseling.

Following the two-day hearing, the superior court granted DCF's petition to terminate the parental rights of both parents. With respect to mother, the court concluded that DCF had established by clear and convincing evidence that: (1) mother had not made sufficient, substantial, sustained, or ongoing progress since K.B. came under supervision of the court; (2) mother's pattern had been treatment, brief periods of sobriety, and then relapse; (3) she had not been consistent with her service providers, with whom she had been involved since 2010; (4) she had not been able to successfully address her drug problems in residential treatment; (5) she had not been consistent with outpatient treatment; (6) although she loved K.B. and he loved her, she was still unable to provide a safe, secure, and nurturing environment for him and had not demonstrated an ability to care for him on a sustained basis; and (7) she was incapable of resuming her parental duties in the foreseeable future. With regard to father, the court concluded that DCF had established by clear and convincing evidence that: (1) father had not made any progress since K.B. came under supervision of the court; (2) he had not complied with the case

plan; (3) he had not seen K.B. since December 2011; (4) he had not played a constructive role in K.B.'s life since the child was born; and (5) he was no closer to playing a constructive role in K.B.'s life than he was when this case was opened in February 2011. The court further stated that: (1) K.B was in a stable and nurturing home where his medical and developmental needs were being met; (2) he needed caregivers who can recognize and respond to his emotional needs; (3) he needed permanency in a structured and stable environment; and (4) removing him from his foster family would detrimentally impact him and thus be contrary to his best interests.

On appeal, father argues that the superior court improperly held him responsible for his lack of contact with K.B., when in fact his efforts to maintain contact with his son were thwarted by mother, DCF, and the court. According to father, DCF looked on passively while mother denied him a number of visits when she was K.B.'s custodian, and the court took no effective action to enforce his right to parent-child contact despite his multiple motions to find mother in contempt. Father further complains that when DCF became the custodian, it set unnecessary prerequisites for visits, such as requiring him to undergo both substance abuse and anger management counseling. Father asserts that these actions discouraged him from exercising his right to visitation.

We do not find these arguments persuasive. The superior court found that mother was responsible for four of the five supervised visits that father missed. Following a motion hearing held in September 2011, the superior court ordered both parties to comply with the existing parent-child contact order. The same day, the court issued a progress order indicating that father would participate in an anger management program and have a substance abuse assessment. The superior court stated that there had to be evidence that father did not have an untreated substance-abuse problem before it would consider moving visits to father's house.

Father filed another motion for contempt in October but withdrew the motion at a November 14, 2011 motion hearing. The court ordered mother to abide by father's scheduled parent-child contact. On December 19, 2011, father filed a request for an emergency hearing, and a hearing was held the next day on father's renewed motion for contempt, but father did not attend the hearing. In its order issued the same day, the court stated that contempt was not established and denied the motion. Father has not visited with his son since then.

At the termination hearing, when asked on direct examination why he did not continue seeing his son, father responded:

> Well, there was a lot of discrepancies in—between me and his mother with the visits and I got discouraged because we would argue a lot about—you know, one day she would bring him and the next, we'd be fighting. And in between that, she would offer for me to come around and be around him while he was with her so I got to see [K.B.] on her terms and at her place of residence.
>
> But pretty much just discrepancy between the visitation and just got discouraged because it was inconsistent and overwhelming at times when I wasn't able to see him.

4

When asked on direct examination why he did not renew visits after custody of K.B. was transferred to DCF in the summer of 2012, father responded that he had talked to the DCF caseworker about reinstituting visitation but that:

> I was told I had to do an assessment and all these other things after the court order—ordered my visits—in order to start my visits back up. Those were the requirements in order for me to see my kid again, you know.

Asked why he did not do a substance abuse assessment, father replied:

> I had a lot of stuff going on in my life. It's really no real excuse or reasoning. I had—I was—I was homeless at the time. I was trying to take care of my other son because, you know, it's really hard working and supporting two other people and fighting for a place to live pretty much. You know, all my money went towards him and, you know, his diapers and his formula and it was just hard.

As such, the record does not establish that father's failure to remain part of K.B.'s life was the fault of mother, DCF, or the court—and thus beyond his control. See In re S.R., 157 Vt. 417, 421-22 (1991) (acknowledging that stagnation caused by factors beyond parents' control cannot support termination of parental rights, but finding no merit to parents' argument that Department caused stagnation in that case; cf. In re D.S. & M.H., 2014 VT 38, ¶¶ 19-20, ___ Vt. ___ (finding that court order limiting father's contact with his son was based on father's criminal conduct and incarceration and thus concluding that father's lack of contact with his son was not beyond his control). To the contrary, the record demonstrates that father stopped seeing K.B. because he was overwhelmed by circumstances in his life. However, father cannot, years later, escape the consequences of his actions with respect to K.B. by blaming mother, DCF, and the court system.

For her part, mother argues that the superior court committed reversible error by not giving the proper weight to the bond that had formed between her and K.B. In support of this argument, mother notes that both her family time coach and DCF caseworker recognized the bond between her and K.B. We find no merit to this argument. As mother acknowledges, the court found that mother loves K.B. and he loves her, but nonetheless concluded termination of her parental rights was necessary because, despite years of being afforded various services, mother had failed to make any substantial or sustained progress in addressing the problems that had led to K.B. being taken into state custody. The court stated that K.B. needed consistency in parenting, a structured environment, and permanency in a stable home, but that mother had made little progress over a significant period of time towards being able to provide such a home to K.B.

This is not a case in which the evidence of a loving parental bond can override the other factors strongly supporting termination of mother's parental rights—in particular, that she would not be able to resume her parental duties within a reasonable period of time from the perspective of a very young child that had already spent a substantial portion of his life in foster care. The

5

court's termination decision is supported by unchallenged findings and conclusions that, in turn, are supported by the evidence. See <u>In re A.F.</u>, 160 Vt. 175, 178 (1993) (stating, with regard to termination order, that "[i]ndividual findings of fact will stand unless clearly erroneous, and conclusions of law will be upheld if supported by the findings").

<u>Affirmed</u>.


BY THE COURT:


_____
Marilyn S. Skoglund, Associate Justice


_____
Beth Robinson, Associate Justice


_____
Geoffrey W. Crawford, Associate Justice