*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2019-043

MAY TERM, 2019

| | |
|---|---|
| In re T.L. & T.L., Juveniles (S.L., Mother\*) | } APPEALED FROM: <br> } <br> } Superior Court, Addison Unit, <br> } Family Division <br> } <br> } DOCKET NO. 79/80-9-17 Anjv <br><br> Trial Judge: Alison S. Arms |

In the above-entitled cause, the Clerk will enter:

Mother appeals from the trial court's order terminating her parental rights in twins Tra.L. and Tro.L.[*] She argues that the Department for Children and Families (DCF) is to blame for her stagnation as a parent and that the court erred in concluding that she could not parent the children within a reasonable time. We affirm.

The court issued a fifty-page decision that included the following findings. Tra.L. and Tro.L. were born in November 2009. Mother has two other children who live in Connecticut with their respective biological fathers. Mother lived in Connecticut between 2009 and 2014 and raised Tra.L. and Tro.L. primarily while living with her mother. In 2014, Connecticut child-welfare authorities received reports that mother neglected and physically abused the children. One of mother's other children sustained a skull fracture, suspected to be the result of physical abuse when less than a year old. Tra.L. reported being struck with a belt in the back and neck; he also reported that mother threw a cellphone at him, leaving a bruise. Connecticut authorities were concerned about mother's low frustration tolerance to parenting children, her mental health and anger issues, and the fact that she appeared overwhelmed in meeting the children's needs. In December 2014, the children were removed from mother's care and maternal grandmother was appointed as their guardian. Mother did not parent the children full-time after late 2014. Mother's therapist at the time opined that mother would need a long period of services to be able to manage the stress of caring for children.

In January 2017, mother moved to California. That same year, grandmother and the children moved to Vermont. Shortly thereafter, grandmother was diagnosed with terminal cancer. During her illness, grandmother was cared for by a licensed nursing assistant. This woman later became the children's foster parent.

---

[*] The court's decision concerned mother only as father had not been physically located by the date of the termination hearing.

Around the time that mother learned of grandmother's illness, mother moved to terminate grandmother's guardianship and relocate the children to California. A Connecticut court denied mother's motion and a referral was eventually made to DCF in Vermont. The referral was based on the guardian's terminal illness and the absence of a permanent caretaker for the children; Connecticut authorities also expressed concern about the children's safety in mother's care. A home study was conducted to see if the children should be placed with mother in California. The home study did not recommend such placement for numerous reasons.

The children came into DCF custody in September 2017 and they were placed in the foster home referenced above. Mother agreed that the children needed care or supervision based on their legal guardian's inability to care for them. At disposition, she agreed to a case plan calling for reunification with mother or adoption; the subsequently amended case plan called for adoption only.

The disposition plan noted various risks to the children and made recommendations to address them. Mother was required, among other things, to provide stability for the children and demonstrate an ability to meet the children's educational and mental health needs. The case plan recounted that the children had been harmed by mother's inability to control her frustrations and emotions, including physical abuse. The plan stated that DCF would provide mother with educational materials to help her understand how adverse childhood experiences affected children and mother was required to display insight into her direct involvement in causing the children harm; she was also required to identify safe and appropriate parenting strategies, and consistently use those strategies even when angry. The plan further found that the children were at risk of emotional harm, physical harm, and neglect due to mother's untreated mental health needs. The plan required mother to seek out a mental health professional, have an assessment, follow all recommendations, and sign necessary releases.

In July 2018, DCF moved to terminate mother's rights. Following a three-day hearing, the court granted its request. The court recited the history of this case in detail. Among numerous other findings, the court recounted that mother made no attempt to have her parental rights reinstated for more than two years after the Connecticut case was closed. She left the children in Connecticut to move to California and when her petition for custody was denied by a Connecticut court, she returned to California. Mother did not return to Vermont until four months after the children were taken into DCF custody when their primary caregiver became too ill to care for them.

While the children were in DCF custody, mother screamed at them during phone calls when the boys said they did not want to speak to her any longer. The calls had to be moved to Fridays because the children were so dysregulated afterward that they needed time to recover before school on Monday. In-person visitation with mother began in January 2018, and it resulted in a marked decline in the children's behavior. The children became aggressive at school, spitting, grabbing, and yelling at the paraprofessionals who worked with them. The children also regressed academically. Due to the children's reaction to visitation, the parties ultimately agreed in May 2018 that Easterseals Family Time Coaching would begin, a forensic evaluation would be prepared, video chats would be discontinued, and, among other things, the parties would meet following the forensic evaluation to discuss therapy going forward.

The Family Time coach explained to mother why hands-off parenting was necessary for children who had experienced physical abuse, but mother struggled to comply. The coach did not believe that mother understood the trauma the children endured. Mother failed to show enough skill in managing the children to move from a closed visitation environment to regular visitation in her home or in the community. Mother struggled to parent both children simultaneously.

In addition to Family Time Coaching, mother also took parenting classes through a program called Aspire Together. The court found that mother failed to demonstrate application of any appropriate parenting strategies taught in these classes, particularly for high-needs children. The court also made findings suggesting that the course material taught at Aspire Together may not have addressed the root problems that mother was having as a parent. The court found that the Aspire Together teacher did not have a background in work with traumatized children, nor was the program designed to work with traumatized children. Some lessons concerned budgeting and practical life skills and other "basic information helpful to most parents." The court found that this type of parenting instruction did not address the root concerns and risks that mother presented to the children, and the areas of concern in this case were much more complex than those addressed by the course. It highlighted the children's special needs and mother's own mental-health history and concluded that this generic parenting course appeared to address none of that.

A forensic evaluation was completed in June 2018 and the termination petition was filed not long thereafter. With respect to the abuse allegations in Connecticut, mother told the forensic evaluator that she "snapped" when she struck Tra.L. with a belt and that she "knows she could prevent herself from doing that again." As to the cellphone injury, mother claimed during the forensic evaluation that she slid the phone off the table because she was angry with the person she was speaking to and that the phone hit Tra.L. as he was running around.

The evaluator concluded, among other things, that mother lacked necessary parenting skills and she did not have the psychological makeup to gain those skills quickly. The evaluator further concluded that mother lacked the present capacity to provide the attuned care that the children needed, and she would need more than a year of work with the Family Time coaches to achieve that goal, if she could achieve it at all. The evaluator determined that mother lacked insight into the negative impact and harm her behaviors had caused and, given this and mother's description of the harm as "snapping," it was possible that this behavior would recur. The evaluator opined that the children had been traumatized by mother's behavior and that adoption, not reunification, was appropriate. Mother had a second forensic evaluation done, but the court discounted many of this evaluator's conclusions. Among other things, it found that mother's statements to the second evaluator failed to recognize the harm she caused the children, both through abuse and her absence in their lives. And she demonstrated a lack of insight into the continuing risk the children faced.

The court found that in early July 2017, mother attempted to run the foster mother off the road. Mother made an obscene gesture at the foster mother and the foster mother had to take an alternate road home. Meanwhile, the children were doing very well in their foster home, and their foster mother provided them the structure, security, and consistency they required. The court found that the foster home and the children's school community were the most stable aspects of the children's lives for more than a year.

3

Based on these and numerous other findings, the court concluded that mother had stagnated in her ability to parent. It found that she failed to meet the case plan's recommendations. She minimally participated in the identified services; she did not engage in therapy directed toward the case plan's recommendation; she minimized the harm caused to the children; she lacked insight into how to control her emotions; and she failed to engage in parenting instruction.

The court concluded that all of the statutory best-interest factors supported termination. It found no reasonable likelihood that mother could resume parenting the children within a reasonable time. It explained that the children had been in DCF custody for sixteen months. They were developmentally disabled and had been repeatedly traumatized by mother's abuse, having multiple caregivers, and the death of their grandmother. They needed a parent who could offer trauma-informed parenting. They were at risk of further emotional and developmental issues as well as an impaired ability to learn at school; they needed a parent who could immediately address their needs. Mother had shown she could not do so. She minimized or denied her physical abuse of the children and she did not understand the children's basic or special needs. She lacked the present capacity to provide the type of care that the children needed. According to a credible forensic evaluation, mother needed more than a year of work with Family Time Coaching to be able to provide the level of necessary care, if she was able to achieve this goal at all. The children could not wait.

In considering this factor, the court also recounted the serious behavioral challenges that arose once the children began visitation with mother in January 2018. The children had to be removed from class several times each day through the end of school year. They soiled themselves and wet the bed. The school had to modify the children's activities on the days they visited with mother given their extreme negative behaviors. This decreased the children's academic time. Mother attributed the children's challenging behaviors to violent video games and non-GMO foods, rather than the upheaval and abuse they had endured. She failed to fully understand the trauma the children had suffered. She failed to show that she could meet the boys' needs; she had not met those needs after the children were initially removed from her care, during grandmother's illness, or at present. Mother's needs and the children's needs had been well known for many years, and those needs remained unaddressed.

The court also highlighted, among other things, mother's failure to adequately address her mental-health issues. It explained that mother had not focused her mental-health treatment on remediating her prior abusive behavior or on the case plan recommendations. The court noted that mother's then-therapist had opined in 2014 that mother would need to engage in services for a significant time before she could parent the children. Since then, mother had not engaged in the type of therapy necessary to manage her emotions so that she could adequately care for the children. For example, the court explained, the case plan expected mother to follow a licensed clinician's recommendations on how to repair the emotional and physical damage she inflicted on the boys, to actively and consistently participate in therapeutic work, and to demonstrate that she could meet children's needs safely and consistently. She was required to acknowledge and identify the risk her actions posed as well as the impact that her actions had on the children, to work with the children to regain their trust, respect the children's wishes when they did not wish to engage with her, and to consistently recognize the children's cues and respond safely and appropriately.

4

While mother had consistently engaged in therapy sessions, the goal of that therapy was regaining custody, not addressing her mental-health needs.

The court found mother's behavior consistent with the parenting limitations described in the first forensic evaluation. The court outlined the evaluator's findings in detail and found that they further showed mother's inability to parent two high-need children. In sum, the court concluded that mother could not care for the children in the manner they needed on a day-to-day basis and she could not resume parenting in a reasonable time as evaluated from the children's perspective. Mother appealed from the court's order.

Mother argues on appeal that the court overlooked that DCF "provided essentially no assistance" to her. She suggests that stagnation resulted from "factors beyond [her] control." In re S.R., 157 Vt. 417, 421-22 (1991). According to mother, there was no evidence that, as recommended in the case plan, DCF provided her "with educational materials to help her understand how adverse childhood experiences affect children." Mother also faults DCF for not "direct[ing] her to an appropriate parenting class" or telling her the class she chose was not appropriate. Mother also contends that, contrary to the court's finding, there was nothing wrong with engaging in therapy focused on regaining custody. If it was not an appropriate focus, mother argues that it is DCF's fault for failing to ensure an appropriate focus. She also complains that visitation was not more frequent. Mother describes her efforts as diligent.

Turning to the best-interest factors, mother argues that the court failed to consider her "prospective ability to parent" in finding that she could not parent the children within a reasonable time. In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325. She also asserts that the court failed to adequately consider that she diligently engaged in parent education, therapy, and parent-child contact and that DCF neglected to guide her diligence in an appropriate direction. Finally, mother asserts that the court overlooked that father's rights have not yet been terminated and the children "cannot achieve permanency" until that occurs.

In a post-disposition setting, "[w]hen termination of parental rights is sought, the trial court must determine, first, whether there has been a substantial change in material circumstances and, second, whether termination is in the child's best interests." In re R.W., 2011 VT 124, ¶ 14, 191 Vt. 108. "A substantial change in material circumstances is most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." Id. (quotation omitted). "Stagnation may be shown by the passage of time with no improvement in parental capacity to care properly for the child." Id.

To determine a child's best interests, the court must consider four statutory factors. See 33 V.S.A. § 5114. The most important factor is the likelihood that the natural parent will be able to resume his or her parental duties within a reasonable time. See In re B.M., 165 Vt. 331, 336 (1996). As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.). We emphasize that "[o]ur role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating mother's parental rights." In re S.B., 174 Vt. 427, 429 (2002) (mem.).

The trial court applied the appropriate standard here in reaching its conclusion and the evidence amply supports its decision. The court found, and the record shows, that mother, not DCF, bears responsibility for her failure to comply with the goals of the case plan. The crux of the court's decision is mother's failure to adequately acknowledge the harm she has caused the children, and her inability to address behaviors that led to this harm. The record is replete with mother's denial or minimization of her abuse of the children and the trauma they suffered. Despite intensive involvement in Family Time Coaching, mother remained unable to gain insight or modify her behaviors. There is an extensive record to support the court's conclusion on this point and, putting aside mother's apparent failure to seek out such materials, mother's shortcomings in this regard were not caused by DCF's failure to provide "educational materials to help her understand how adverse childhood experiences affect children."

It was clearly stated in the disposition report, moreover, that mother needed to learn safe and appropriate parenting strategies in light of the harm she caused the children and that these strategies must be aimed at managing her frustrations and emotions and preventing additional abuse from occurring. Indeed, that goal was evident as early as 2014. It was evident that the basic parenting class that mother took did not address these issues and to the extent that mother needed clarity on this point, she could have sought advice from DCF. There is no indication that she did so.

This is equally true with respect to the therapy in which mother engaged. Again, the case plan clearly stated that mother needed to have a mental-health assessment conducted because the children were at risk of emotional harm, physical harm, and neglect from mother's untreated mental-health needs. The requirement was clear and to the extent that mother did not understand what was expected of her, she could have sought clarification. The court found that mother did not have an assessment done, nor did she focus on minimizing the risks described in the case plan. Mother's therapy was initiated based solely on mother's subjective description of why the children were in DCF custody and it was guided by mother's goal of regaining custody of the children. The therapy did not address mother's unmet mental health needs or diagnoses. Indeed, the therapist was uncertain regarding mother's diagnosis and could not remember how she characterized mother's diagnosis for insurance billing purposes. The court did not err in finding that mother's therapy failed to address the basic requirement of the case plan and that it had not reduced the risk to the children.

Mother also fails to show that limited visitation led to the court's stagnation finding. The severe negative effects from visitation are set forth above, as are the court's findings regarding mother's struggles with the level of visitation afforded. Additionally, as indicated, the parties agreed to the particular level of visitation that occurred. While mother characterizes her efforts as diligent, the court found them insufficient. Its stagnation decision is supported by the findings and the record.

We thus turn to mother's challenge to the court's best-interests conclusion, and in particular, that she could not resume her parental duties "within a reasonable period of time from the perspective of the child[ren]'s needs." In re N.L., 2019 VT 10, ¶ 9 (quotation omitted). We have explained that "[a]lthough this inquiry is forward-looking in the sense that the court must

6

consider the parent's prospective ability to parent the child, past events are relevant in this analysis." Id. The court applied the correct standard in considering mother's ability to parent within a reasonable time, and its analysis was appropriately forward-looking. The court effectively concluded, based on its findings of fact and conclusions of law, that it would take mother at least a year to gain necessary parenting skills, if she could do so at all. This was consistent with the evidence from the first forensic evaluator. This evidence, as well as that set forth above and contained in the court's decision, amply supports the court's conclusion that mother cannot parent the children within a reasonable time. We reiterate that mother is responsible for her lack of progress during the period the children have been in DCF custody. We also reject mother's assertion that she should have been afforded additional time to gain parenting skills because father's rights have not yet been terminated. We have explicitly rejected this argument in the past and find no basis to reach a different conclusion here. See id. ¶¶ 16-17 (explaining that Court has "explicitly rejected the argument that the family division is precluded from terminating one parent's parental rights while leaving the other parent's rights intact"); see also In re A.D.T., 174 Vt. 369, 376-77 (2002) (rejecting mother's argument that because father's parental rights remained intact at time of order terminating her parental rights, "the court should have allowed her to continue to work towards reunification").

Affirmed.

BY THE COURT:

Beth Robinson, Associate Justice

Harold E. Eaton, Jr., Associate Justice

Karen R. Carroll, Associate Justice

7