VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      23-AP-013

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

MAY TERM,   2023

| | |
|---|---|
| In re N.C., A.C., M.J.C., Juveniles<br>(P.C., Father\*) | } APPEALED FROM:<br>}<br>} Superior Court; Orleans Unit,<br>} Family Division<br>} CASE NOS. 132-11-19 Osjv; 74-6-19 Osjv;<br>75-6-19 Osjv<br>Trial Judge: Thomas J. Devine |

In the above-entitled cause, the Clerk will enter:

Father appeals the family division's decision terminating his parental rights to minor children A.C., N.C., and M.J.C.[*] We affirm.

A.C. was born in May 2016 and N.C. was born in November 2017.  In June 2019, the State filed petitions alleging that A.C. and N.C. were children in need of care or supervision (CHINS) based on allegations that mother was using and selling illicit drugs in their presence and had left them in a drug house with an unsafe caregiver.  Father was incarcerated at the time the petitions were filed.  The court issued emergency- and temporary-care orders transferring custody of the children to the Department for Children and Families (DCF).  In October 2019, mother stipulated to the merits of the petitions.

M.J.C. was born in November 2019.  Shortly after his birth, the State filed a petition alleging M.J.C. was CHINS due to the allegations in the previous petitions and mother's continued use of fentanyl and cocaine during her pregnancy.  The court transferred custody of M.J.C. to DCF.  Mother stipulated to the merits of the petition concerning M.J.C. in late November 2019.  The three siblings were placed together in the same foster home, where they continued to reside throughout the proceeding.

---

[*] The decision also terminated mother's parental rights.  Mother did not appeal.

In December 2019, the court issued disposition orders for all three children, each of which established a permanency goal of reunification with either mother or father. The disposition case plans called for father to demonstrate an ability to supervise and monitor the children appropriately through Family Time Coaching or another suitable setting, place the children's needs above his own, and work with a designated agency to learn about the children's developmental and attachment needs. The family division approved the case plans and additionally ordered that "[f]ather, once he completes his criminal case dispositions, shall abide by [Department of Corrections] programming, participate in [Family Time Coaching], and if a Parenting with Respect program becomes available, he shall participate in the program."

In June 2021, DCF moved to terminate both parents' rights to A.C., N.C., and M.J.C. A final hearing was held over three days in May, August, and December 2022. Father did not appear at the first day of hearing but was present on subsequent days.

In a written decision issued in December 2022, the family division made the following findings. Father went to prison when A.C. was two years old and N.C. was almost one year old. M.J.C. was born while father was incarcerated. Due to father's criminal behavior and resulting incarceration, father had not been the children's primary caregiver and had not been available to parent them for significant portions of their lives.

After father was released on furlough in January 2021, he met with the DCF case worker, who reviewed the case plan with him. They discussed that father's biggest challenge would be forging a bond with the children after being absent from their lives for a long period. Father complied with his furlough conditions, signed releases for DCF, and found safe and suitable housing. He also found employment at a factory. He enrolled in a medication-assisted-treatment program where he was prescribed methadone. The court found that substance abuse did not appear to be an issue for father. Father completed the Parenting with Respect class, participated in Family Time Coaching, and completed an educational program on child development.

Father had contact with the children twice a week: in person on Thursdays and by telephone on Mondays. During the in-person visits, he was unable to safely supervise the children. Father had positive interactions with M.J.C. but A.C. and N.C. did not listen to father or refer to him as their dad. They would run in separate directions, throw food, and dump drinks on the floor. On one occasion, N.C. left the visitation area and ran down the hallway before being intercepted by DCF staff.

Father had high expectations for the visits and did not understand the children's reactions. When the DCF worker told father that he needed to make more of an effort to control the children, father suggested that the visits be moved to a locked room to prevent the children from escaping. The DCF worker did not think this was a good idea. The DCF worker suggested that father not bring sugary drinks for the children. Father protested that because his time with the children was so limited, he needed to "spoil" them.

Father's home in Franklin County was a long drive from the DCF office in Newport where visits took place. He had previously lost his driver's license due to driving under the influence and struggled to attend visits. The DCF worker attempted to arrange for alternate transportation by bus, paying friends or family members, and having father stay in Newport the

night before a visit. Despite these accommodations, father attended only seventy percent of in-person visits.

Father's telephone contact with the children did not go well. Father did not call consistently. When calls did go through, A.C. often refused to speak to father, and N.C.'s attention span would wander after a minute or two. After learning that the telephone calls were not successful, the DCF case worker offered to arrange an additional in-person visit on Mondays. Father declined due to his work schedule. Instead, father accepted the opportunity to have longer visits on Thursdays.

In March 2022, father participated in a parenting-capacity evaluation with a forensic psychologist. The psychologist reported that M.J.C. appeared to have formed a healthy attachment to father, who provided competent care for M.J.C. and displayed obvious signs of love and affection. However, A.C. refused to interact with father and N.C. ran away from him and engaged in aggressive behavior. The psychologist opined that father did not appear to be capable of meeting all three children's physical, emotional, or developmental needs at that time. If reunification were the goal, the psychologist recommended that father engage in individual therapy to understand the children's trauma and the impact of separating them from their foster parents. She further recommended that father have separate visits with M.J.C. and each of the older children. She opined that it would likely take months for N.C. and A.C. to feel comfortable around father and to progress to individual visits with him.

Father believed that the children were restless and bored with visits at the DCF office and asked to have visits at a park or playground. DCF denied the request due to concerns about father's ability to supervise the children. Father brought his tablet to visits so the children could watch movies. The visit supervisor told father that he needed to be more interactive with the children. He attempted to color with them and engage in play but found it difficult to manage all three together. In mid-August 2022, father decided to boycott the visits until a better location was offered. As of the December 2022 hearing, father had not had in-person contact with the children for four months.

When asked at the hearing whether he thought removing the children from their foster home would be harmful to them, father said it would be no worse than taking them from their biological parents. He was optimistic that the children could transition to his care within six months without any difficulty. The court found that father lacked insight into the children's emotional needs.

The court concluded that there was a change in circumstances warranting modification of the initial disposition order because father had stagnated in his progress toward reunification. The court noted that father did not begin engaging in the case plan until January 2021, six months after the target date for reunification had already passed. It found that father's incarceration and resulting inability to care for or visit with the children were circumstances within his control. The court found that after his release, father successfully achieved many of the case plan recommendations. However, he had unrealistic expectations that the children would be overjoyed to see him when he was released from incarceration and was not able to manage all three children together. The court found that the reunification plan proposed by the forensic psychologist would take several additional months of intensive services and was not

3

guaranteed to succeed. Father subsequently decided to stop attending visits altogether, making the likelihood of successful reunification untenable.

The court then assessed the best-interests factors. It found that A.C. and N.C.'s bond with father was severely damaged. M.J.C. had begun to form a bond with father, but it was not yet greater than his bond with his foster parents. The court found that it would be damaging to separate the children from each other. All three children were well-adjusted to their foster home and community, where they had lived for three years, and were thriving in a structured home routine. The court found that father was unlikely to be able to resume parental duties within a reasonable period due to A.C. and N.C.'s resistance to visits and his decision to stop attending visits, as well as the need for father to engage in therapy to better understand their emotional needs. Finally, it concluded that father loved the children but had not played a constructive role in their lives. It therefore found that termination of father's parental rights was in the best interests of the children. Father appealed.

Father claims that the decision below must be reversed because the evidence did not support the court's finding of stagnation. He argues that he accomplished many of the action steps in the case plan. In particular, he cites evidence that he had formed a strong bond with M.J.C. He argues that his inability to rebuild his bond with A.C. and N.C. was due to DCF's refusal to provide him with adequate support by allowing him to have visits in a room with a locked door.

When the State seeks to terminate parental rights after initial disposition, the court must first determine whether there has been a change in circumstances justifying modification of the original disposition order. In re B.W., 162 Vt. 287, 291 (1994). If this threshold condition is met, the court must then consider whether termination is in the child's best interests in accordance with the factors set forth in 33 V.S.A. § 5114(a). The requisite change in circumstances "is most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." Id. (quotation omitted). "The key question for the court when considering whether stagnation has occurred is whether the parent has made progress in ameliorating the conditions that led to state intervention." In re T.M., 2016 VT 23, ¶ 12, 201 Vt. 358 (quotation omitted). "We will affirm the court's decision if the findings are based on the evidence and support the court's conclusions." In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639 (mem.).

The family division's findings support its determination of stagnation in this case. Due to his incarceration, father did not begin participating in the case plan until eighteen months after the children entered DCF custody. "[O]ur case law makes clear that a parent is responsible for the behavior that leads to incarceration and for the consequences that come with such incarceration." In re D.S., 2014 VT 38, ¶ 26, 196 Vt. 325. Father's lack of progress during the first year and a half of the proceedings below was therefore attributable to his own behavior, not DCF. The court found that, to father's credit, he had actively engaged in the case plan once he was released from prison. He achieved many of the case plan's recommendations including finding stable and suitable housing, maintaining sobriety, completing parenting education classes, and participating in Family Time Coaching. However, "the mere fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of" stagnation. In re A.F., 160 Vt. 175, 181 (1993). While acknowledging that father had managed

4

to form a bond with M.J.C., the court found that father's absence had damaged his relationship with A.C. and N.C. and he was unable to understand why they had anxiety and confusion during their visits with him. Father's lack of insight impeded his ability to connect with A.C. and N.C. and to safely supervise all three children at once. He never progressed beyond one supervised visit each week. Father unilaterally decided to stop visits because DCF would not let him conduct them outside. By the final day of the hearing, he had not seen the children in person for four months. These findings were sufficient to support the court's conclusion that father had stalled in his progress towards reunification as measured by the case plan expectations, which required father to demonstrate an ability to supervise and control the children and to understand their developmental and emotional needs. See id. at 178 ("We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence.").

Father asserts that his stagnation was caused by a factor beyond his control, namely, DCF's refusal to grant his request to conduct visits in a room that could be locked to prevent the children from escaping. We have stated that "stagnation caused by factors beyond the parents' control could not support termination of parental rights." In re S.R., 157 Vt. 417, 421-22 (1991). The record does not support father's claim that his stagnation was caused by DCF's failure to give him adequate support. Even assuming that conducting visits in a locked room would have been a reasonable accommodation, the court found that father's inability to control the children stemmed from their anxiety and confusion about his reappearance after a long absence from their lives, which he failed to understand or address. Father does not explain how locking the children in a room with him during visits would have solved this underlying problem. Moreover, the record shows that DCF offered numerous supports over eighteen months to assist father with improving visits, by offering additional in-person time, arranging for transportation, and offering constructive feedback to help father with supervising the children. The claim that DCF caused his stagnation through lack of support is therefore without merit.

Father argues that the court improperly compared his and the foster parents' abilities to parent M.J.C., rather than focusing on his ability to resume parental duties in the future. We disagree that the court applied the wrong standard in considering the children's best interests. The court applied the four factors set forth in 33 V.S.A. § 5114(a) and concluded that each weighed in favor of termination. With regard to the third and "most important factor," In re J.B., 167 Vt. 637, 639 (1998) (mem.), the court found that father would not be able to resume parenting the children within a reasonable amount of time due to his failure to repair his relationships with A.C. and N.C. or understand their emotional needs and his decision to stop attending visits four months earlier. These findings were supported by the evidence. As for the court's findings regarding the foster parents, the statute expressly requires the court to consider "the interaction and interrelationship of the child with his or her . . . foster parents," and "the child's adjustment to his or her home, school, and community." 33 V.S.A. § 5114(a)(1), (2). It was therefore not error for the court to consider the children's relationships and attachments to their foster family in weighing their best interests.

Father also suggests that the court should not have terminated his parental rights to M.J.C. because the evidence showed that he had begun to build a bond with M.J.C. The court acknowledged father's progress with M.J.C. but concluded that it would be harmful to separate the children from each other and that it would take many more months for father to be able to understand and address the older children's needs. Father's ability to assume a parental role for

5

any of the children within a reasonable time was further undermined by his decision to stop in-person contact in August 2022. The family court had discretion to weigh the evidence and its findings are supported by the record. In re A.F., 160 Vt. at 178. We therefore will not disturb the decision below.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Karen R. Carroll, Associate Justice

_____
William D. Cohen, Associate Justice