NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 28

No. 2015-357

| | |
|---|---|
| In re M.W., Juvenile | Supreme Court |
| | On Appeal from<br>Superior Court, Essex Unit,<br>Family Division |
| | January Term, 2016 |

M. Kathleen Manley, J.

Michael Rose, St. Albans, for Appellant Father.

William H. Sorrell, Attorney General, and Elizabeth M. Tisher, Assistant Attorney General, Montpelier, for Appellee.

PRESENT: Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.

¶ 1.   **REIBER, C.J.**   Father appeals an order of the superior court, family division, terminating his parental rights with respect to his son, M.W.  He contends that his extended pre-trial incarceration cannot support the family court's termination order.  We affirm.

¶ 2.   The facts are not in dispute.  M.W. was born in August 2010.  M.W. lived with his young parents in the maternal grandparents' home for several months before moving into an apartment that the maternal grandfather built over a garage located fifty feet from the grandparents' home.  During the approximately three years that the parents lived there, the mother and her parents were M.W.'s primary caregivers, as father worked two jobs and was away from the home much of the time.

¶ 3.    On October 8, 2013, father was arrested and charged with four counts of aggravated sexual assault on minors under the age of thirteen and four counts of lewd and lascivious conduct with a child.  Father was also charged with two counts of obstructing justice, one count of violating an abuse prevention order, and one count of violating conditions of release.  M.W. was not the putative victim of any of the charged crimes.  Ten of the twelve counts are felonies, the most serious of which—aggravated sexual assault on a minor under the age of thirteen—has a potential life sentence with a mandatory minimum of ten years to serve.  The lewd-and-lascivious-conduct counts have a mandatory minimum sentence of two years to serve.  The Department for Children and Families (DCF) substantiated father for abuse based on the conduct that led to the criminal charges.  Father administratively appealed the substantiation, and that appeal has been stayed pending resolution of the criminal charges.

¶ 4.    On two occasions, father was denied bail on his criminal charges, the first time based on the criminal division's conclusion that the evidence of guilt was great, and the second time, in February 2014, based on the criminal division's determination that the evidence of guilt was great and that there was clear and convincing evidence that father's release would pose a substantial threat of physical violence to someone.  Father did not appeal the denial of bail, and he remained in jail awaiting trial at the time of the termination hearing in August 2015.

¶ 5.    Meanwhile, in July 2014, the State filed a petition alleging that M.W. was a child in need of care or supervision (CHINS) due to the fact that he was the victim of unexplained, non-accidental injuries while in the mother's care.  That same month, the mother stipulated to an adjudication of CHINS.  Custody of M.W. was transferred to DCF, and the boy was placed with the maternal grandparents, with whom he has lived ever since.  DCF initially developed a disposition plan with concurrent goals of reunification with the mother or adoption.  DCF later outlined an amended plan describing what father would need to do before being considered for

reunification, including submitting to a psychosexual evaluation, engaging in parent education, and getting reintroduced to M.W. But before that plan was submitted to the family court for consideration, DCF changed the case plan to the singular goal of adoption.

¶ 6. At a December 2014 hearing, DCF and the juvenile's attorney opposed father-child contact, citing M.W.'s emotional state and the fact that M.W. had not seen father since a thirty-minute December 2013 prison visit. The parties agreed, however, that father could send M.W. letters that would be screened by DCF and forwarded to the grandparents for them to determine when it would be appropriate to show the letters to M.W. That same month, DCF filed a petition to terminate the mother's and father's parental rights. Mother voluntarily relinquished her parental rights conditioned on father's parental rights being terminated, and on August 26, 2015, the family court held an initial disposition hearing in which the State sought termination of father's parental rights.

¶ 7. At the termination hearing, the State presented testimony from father, M.W.'s maternal grandfather, and M.W.'s DCF caseworker. Father also testified briefly on his own behalf and presented testimony of the DCF caseworker who had been assigned to him when he was in DCF custody. Father testified that he did not know when he would be brought to trial on the pending charges. A trial date in father's criminal case was scheduled for October 29, 2015, at the time of the termination hearing, but previously scheduled trial dates had been continued on a number of occasions, and in fact his trial is now scheduled for mid-April 2016. At the termination hearing, a DCF caseworker testified, among other things, that M.W., who had been severely traumatized, was fearful of leaving his grandparents and did not remember father. She opined that M.W. needed to know that he was going to be able to remain with his grandparents, with whom he was "joined at the hip."

¶ 8. Following the presentation of evidence, the family court made findings and conclusions from the bench before determining that terminating father's parental rights was in M.W.'s best interests. The court focused on the most critical of the best-interests criteria— whether father would be able to resume his parental duties within a reasonable period of time from the perspective of M.W. See 33 V.S.A. § 5114(a) (stating best-interests criteria); see also In re B.M., 165 Vt. 331, 337, 682 A.2d 477, 480 (1996) (stating that "we have repeatedly emphasized" that whether parental rights can be resumed within reasonable time from child's perspective is "the most critical factor in a termination-of-parental-rights case").

¶ 9. The court found that the two years during which M.W. had not seen father was a significant period of time for M.W., considering the child's age and needs. The court pointed out that even if father's trial were held as scheduled on October 29 and father was acquitted of all twelve charges, he would still face the substantiation of abuse that he had administratively appealed. The court further stated that if the substantiation was upheld on appeal, father would be required to undergo a psychosexual evaluation, and, in any event, would have to engage in parent education before being reintroduced to M.W. Indeed, as the court noted, father himself acknowledged in his testimony that he would not be able to assume primary care of M.W. in the immediate future in the event that the termination petition was denied.

¶ 10. Thus, the court concluded that even under the best case scenario for father, it would take a significant amount of time from the date of the termination hearing for him to reach the point where he could care for M.W., who had already spent much of his formative life with his maternal grandparents, with whom he was now thriving. Moreover, the court stated that much of M.W.'s life had been in turmoil, and that he had an absolute need for stability and permanency to feel safe. In the court's view, even if the charges against father were eventually dismissed or he was acquitted following a trial, and he immediately undertook the case plan

recommended by DCF, an unreasonable period of time from M.W.'s perspective would have passed, given M.W.'s past traumatization and his immediate need for stability.

¶ 11.    Father appeals the termination order, arguing that: (1) the bail hearing findings in connection with father's criminal case and DCF's substantiation of abuse provide no competent or relevant evidence to support the family court's termination order; and (2) the court terminated his parental rights solely based on factors beyond his control.

¶ 12.    Regarding his first argument, father cites 13 V.S.A. § 7553a, which provides that a person charged with a felony involving violence, as he has, "may be held without bail when the evidence of guilt is great and the court finds, based upon clear and convincing evidence, that the person's release poses a substantial threat of physical violence to any person." He points out that the clear-and-convincing-evidence standard in § 7553a applies only to whether the defendant poses a substantial threat of violence to another person, and that the criminal division's role at a bail hearing is not to resolve "conflicts between inculpatory or exculpatory facts," but rather to "decide if the State has substantial, admissible evidence legally sufficient to sustain a verdict of guilty." State v. Turnbaugh, 174 Vt. 532, 534, 811 A.2d 662, 665 (2002). In father's view, because a bail hearing is not an adjudication on the merits in a criminal prosecution, the criminal division's bail findings had no relevance to the termination proceeding. By the same token, father asserts that because a substantiation of abuse does not satisfy the clear-and-convincing-evidence standard required in a termination hearing, see In re Selivonik, 164 Vt. 383, 388, 670 A.2d 831, 835 (1995) (stating that "agencies investigating reports of suspected child abuse need not apply a preponderance of evidence standard to their determinations"), it is not competent evidence in a termination hearing. Compare Siegel v. Misch, 2007 VT 116, ¶ 6, 182 Vt. 623, 939 A.2d 1023 (stating that court is not required "to give deference to or follow DCF substantiation decisions") with In re A.W., 164 Vt. 412, 416, 670 A.2d 1265, 1267 (1995)

5

(stating that finding of stagnation based in part on father's refusal to accept treatment for sexually abusive behavior could not be adequately reviewed absent finding, by clear and convincing evidence, that abuse actually occurred).

¶ 13. We need not address father's arguments, which do not respond to the principal bases underlying the family court's termination decision.[*] The court did not base its termination decision on the assumption that father would be found guilty of some or all of the charges against him. Indeed, the court explicitly stated that it is "not placing blame on [father]" and that its termination decision is not the result of "an examination of who's at fault for what actions," but rather a consideration of M.W.'s needs and father's ability to assume a parenting role within a reasonable period of time, given those needs.

¶ 14. As noted, the court found that M.W. was finally settling into a stable situation after nearly two years of uncertainty—a "highly significant" portion of the young child's life— and that his grandparents were an "integral" part of his life. The court concluded that, from five-year-old M.W.'s perspective, "he absolutely needs stability" in that "he needs to know where he's going to live" and that it is "going to be a permanent home for him" where "he's safe." In the court's view, it could not postpone permanence for M.W., considering his tender age, the two years he had already spent in DCF custody, his immediate need for stability and permanence, the uncertainty as to how long father would remain incarcerated, and the significant time it would take to reintroduce father to M.W. even if father were acquitted of all of the charges pending

---

[*] In any event, it was not the findings of the bail hearing that the family court found by clear and convincing evidence, but rather the fact of father's extended incarceration—that he had been incarcerated for nearly two years and would continue to be incarcerated pending trial because of the serious charges against him and the fact that he had been denied bail. As discussed above, the court was concerned with the effect of father's extended incarceration on his ability to parent M.W., not on the merits of the criminal charges. By the same token, the court was concerned with the potential effect of the substantiation of abuse on father's ability to resume parental duties should the substantiation ultimately cause the court to determine that a psychosexual evaluation would be necessary prior to any contact between father and M.W.

6

against him.  See <u>In re C.P.</u>, 2012 VT 100, ¶ 30, 193 Vt. 29, 71 A.3d 1142 ("The reasonableness of the time period [to be able to resume parental duties] is measured from the perspective of the child's needs, and may take account of the child's young age or special needs.").  The record supports the court's determination that, given M.W.'s and father's circumstances, termination of father's parental rights is in M.W.'s best interests.

¶ 15.  Father argues, however, that because neither the bail decision nor the substantiation of abuse can support the family court's termination decision, the decision was based solely on factors beyond his control—namely, his pretrial incarceration—which is prohibited by our case law.  See <u>In re S.R.</u>, 157 Vt. 417, 421-22, 599 A.2d 364, 367 (1991) (stating that "stagnation caused by factors beyond the parents' control could not support termination of parental rights," but rejecting as meritless parents' argument that DCF caused stagnation).

¶ 16.  In making this argument, father seeks to distinguish an earlier case in which this Court stated that "our case law makes clear that a parent is responsible for the behavior that leads to incarceration and for the consequences that come with such incarceration."  <u>In re D.S.</u>, 2014 VT 38, ¶ 26, 196 Vt. 325, 97 A.3d 882; see also <u>In re K.F.</u>, 2004 VT 40, ¶ 12, 176 Vt. 636, 852 A.2d 584 (rejecting father's argument that his frequent incarceration was due to factors beyond his control); <u>B.M.</u>, 165 Vt. at 337, 340-42, 682 at 480, 482-83 (recognizing that father's past circumstances, including his incarceration, had affected his parent-child relationship and were relevant to whether he could resume parenting duties within reasonable period of time).  In <u>D.S.</u>, both fathers involved in the case were incarcerated on pending criminal charges at the time of the termination hearing.  One father had thirty prior criminal convictions and had not seen the subject child for eighteen months due to court-ordered conditions preventing him from having any contact with the child.  The other father also had an extensive criminal history.  Both fathers

expressed optimism that their pending charges would be dismissed, but this Court concluded that "given their significant criminal histories, there remained a very real concern that they would not be able to stay out of jail and find stable homes and employment." D.S., 2014 VT 38, ¶ 16. We rejected one of the fathers' arguments that the trial court's termination decision was based in material part on a factor beyond his control—the existence of a court order preventing him from contacting the child. We stated that the father was "solely responsible for the criminal behavior that led to his incarceration and to the imposition of conditions limiting his contact with D.S." Id. ¶ 20; see also K.F., 2004 VT 40, ¶ 12 (rejecting father's argument that trial court's termination decision was based on factors beyond his control and stating that "father bears sole responsibility for his frequent incarceration, his failure to maintain consistent contact with [DCF], and his lack of a bond with K.F.").

¶ 17.    By the same token, we rejected in D.S. the other father's argument that the trial court impermissibly based its termination decision on the fact that he was incarcerated for most of the subject child's life, stating that "[t]he fact of father's incarceration is a proper consideration in the court's analysis of father's fitness pursuant to the statutory standard." 2014 VT 38, ¶ 26. We explained that the father's incarceration for most of the child's life "is certainly relevant in assessing his relationship with [the child], his ability to parent [the child], and whether he has played a constructive role in [the child's] life." Id. (stating that father's "incarceration has a direct impact on his availability as a parental resource to" his child). While recognizing that the father had taken advantage of available contact with the child and prison programming, we concluded that the evidence supported the family court's determination that the father was incapable of parenting the child. Id.

¶ 18.    Father argues that D.S. and K.F. are distinguishable in that the fathers in those cases had extensive criminal histories, including multiple past convictions, whereas in this case

there is no evidence of any past criminal convictions and he has not been convicted of the pending charges. While these cases can be distinguished on their facts from the case before us, it was appropriate for the family court, irrespective of the fact that the criminal charges against him were still pending, to consider father's incarceration and the consequences of his incarceration in evaluating what course of action was in M.W.'s best interests.

¶ 19. While due regard must be given to constitutionally protected parental rights, those rights are not absolute and may be overcome when the child's best interests require it. See In re C.L., 143 Vt. 554, 558, 468 A.2d 563, 565 (1983) (stating that mother's "right to the care, custody, and control of [her] children, although fundamental, is not absolute and may be overcome by the State's interest, under the doctrine of parens patriae, in ensuring the protection and care of its juveniles"). The Legislature's statutory best-interests criteria recognize the rights of both the parents and the children in CHINS proceedings, but the "polestar" of those proceedings is "the best interests of the child." In re D.R., 136 Vt. 478, 481, 392 A.2d 951, 952 (1978); see In re B.S., 166 Vt. 345, 352, 693 A.2d 716, 721 (1997) ("The primary concern of the family court, when acting as a juvenile court, is to protect the welfare of the child.").

¶ 20. As this Court stated over thirty years ago in the context of a custody dispute in a divorce action involving a stepparent, " '[t]he day is long past in this State, if it had ever been, when the right of a parent to the custody of his or her child . . . would be enforced inexorably, contrary to the best interest of the child, on the theory solely of an absolute legal right.' " Paquette v. Paquette, 146 Vt. 83, 88-89, 499 A.2d 23, 28 (1985) (quoting Bennett v. Jeffreys, 356 N.E.2d 543, 546 (N.Y. 1976)). Rather, " 'the best interest of the child has always been regarded as superior to the right of parental custody.' " Id. (quoting Bennett, 356 N.E.2d at 546). This truism "reflects the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest." Id.

¶ 21.   Essentially, father is arguing that the family court is precluded from basing a termination order on extended pretrial incarceration—absent evidence of a parent's extensive prior criminal history—because, short of a conviction, there is no proof that the incarcerated parent's actions were within the parent's control.  If we were to hold as such, then the parental rights of a parent with severe mental illness could not be terminated, even if that disability prevented the parent from caring for his or her children.  See B.S., 166 Vt. at 352, 698 A.2d at 720 (stating that while mental disability, in and of itself, is not ground for terminating parental rights, family court may terminate parental rights based on statutory best interests criteria).

¶ 22.   Our statutory imperative requires the family court to review the individual circumstances of each child to determine how a parent's incarceration—whether pretrial or not— affects the child's best interests.  The court must take into consideration all of the relevant factors, including the nature of the relationship between the parent and child before incarceration, the terms of the incarceration, the needs of the child, and the effect of incarceration on the parent's ability to remain involved with the child and to be in a position to resume parental duties within a reasonable period of time from the perspective of the child.

¶ 23.   Here, as noted, the family court found that: (1) father was never M.W.'s primary caregiver; (2) father was incarcerated when M.W. was three years old and is now an unknown person to M.W.; (3) father had been incarcerated for nearly two years at the time of the termination hearing, during which period M.W. endured trauma and has since developed a significant bond with his maternal grandparents, with whom he has been placed; (4) M.W. is a fragile child in dire need of stability and permanence; (5) the length of father's incarceration is uncertain; and (6) even if father is ultimately not convicted of the multiple crimes with which he has been charged, it would require a significant period of time for him to be reintroduced to M.W. and become part of the child's life.  These findings, which are supported by the evidence,

10

in turn support the court's termination order. See <u>D.S.</u>, 2014 VT 38, ¶ 22 ("As long as the [family] court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." (quotation omitted)); cf. <u>In re R.W.</u>, 154 Vt. 649, 650, 577 A.2d 253, 254 (1990) (mem.) ("The child's right to a stable home life, coupled with complete uncertainty as to when [mother] might surmount her difficulties in caring for R.W., supports the court's determination that [mother] will not be able to resume her parental responsibility for R.W. within a reasonable time.").

    <u>Affirmed</u>.

FOR THE COURT:

_____

Chief Justice