VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.        22-AP-351

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JUNE TERM,   2023

| | |
|---|---|
| In re N.H., Juvenile<br>(A.H., Father\*) | } **APPEALED FROM:**<br>}<br>} Superior Court, Franklin Unit,<br>} Family Division<br>} CASE NO. 10-1-21 Frjv<br>Trial Judge: Mary L. Morrissey |

In the above-entitled cause, the Clerk will enter:

Father appeals from the trial court's order terminating his parental rights to his son, N.H. We affirm.

N.H. was born in January 2021 and immediately entered custody over the Department for Children and Families (DCF) due to mother's substance abuse during pregnancy.  N.H. was placed with his maternal aunt, where his sibling also lives, and continued to live there throughout the pendency of the case.

At the time of N.H.'s birth, father had pending criminal charges against him and was not in contact with mother.  In March 2021, father pled guilty to several criminal charges, including domestic assault.  He began serving a one-year prison sentence in April 2021.

In October 2021, the court held a merits hearing and adjudicated N.H. a child in need of care or supervision (CHINS) based on a stipulation presented at the hearing.  The stipulation— agreed to by mother, DCF, and the juvenile's guardian ad litem and attorney—stated that N.H. was a CHINS due to mother's abusive relationship with her boyfriend (not father) and her substance abuse during pregnancy.[*]

In January 2022, the court adopted a disposition case plan with a goal of reunification with either parent by July 2022.  Father's case-plan expectations included engaging in a mental-health evaluation, working with mental-health clinicians to develop coping skills for stressful situations, participating in parenting class and family time coordination, and developing a plan

---

[*] Father's signature does not appear on the stipulation, and it is unclear from the record whether he attended the merits hearing or otherwise agreed to the court's order.  We do not consider this issue because father did not appeal the CHINS determination following initial disposition and he does not raise any related arguments on appeal.

for how he will support N.H. financially. The court noted that many of the action steps would not be able to occur until father was released from prison.

While in prison, father worked with DCF to some extent. Although he had never met N.H., DCF shared pictures and updates about N.H. Father indicated that he was eager to meet N.H. During incarceration, father completed risk-reduction programming and saw a mental-health counselor.

Father is diagnosed with schizophrenia and post-traumatic stress disorder (PTSD). He has taken prescribed medications for these conditions but also admitted to sometimes forgetting to take them.

Father was released in March 2022 and met N.H. for the first time in May 2022, when N.H. was seventeen months old. In June 2022, father began Family Time coaching and having visitation a few times a week. However, father failed to complete a mental-health evaluation or engage in counseling after leaving prison. DCF noted several troubling incidents during visits with N.H., including father talking to third persons not in the room, talking to himself, becoming visibly agitated and not noticing N.H. was in the room, and having unrealistic expectations of N.H.

In August 2022, DCF moved to terminate mother's and father's parental rights. Mother voluntarily relinquished her rights to N.H. in October 2022, but father contested the petition. The court held a termination hearing for father in October 2022 and issued a written decision terminating his parental rights in November 2022.

In its final order, the court made thorough findings of facts and conclusions of law. It concluded that father's progress had stagnated, so there was a change in circumstances warranting analysis of N.H.'s best interests. This determination was based on father's ongoing struggles with mental health and his failure to engage with treatment; his failure to connect with a domestic-violence specialist or engage in a parenting program; and his failure to demonstrate the ability to meet N.H.'s basic needs and complex developmental needs due to fetal alcohol syndrome.

The court proceeded to analyze all of the statutory best-interests factors. The court relied on the same findings relevant to stagnation as well as the following. Father did not meet N.H. until N.H. was seventeen months old, and since then his contact with N.H. had been approximately twice per week, limited to supervised visits in structured settings. While father was engaged with N.H. and receptive to parenting feedback when these visits began, father became more detached and struggled to show an appreciation for N.H.'s developmental, emotional, and physical needs over time. N.H. was emotional after visits with father and looked to his foster mother for comfort. N.H. never looked to father to meet his basic needs. The court was also concerned about the stability of father's housing situation because at the time of the termination hearing he was temporarily living with friends, did not have any lease agreement, and the status of any permanent housing was unclear.

Although the court noted that father had maintained employment, abided by conditions of his parole, maintained contact with DCF, loved N.H., and genuinely wanted to parent N.H. in the future, the court concluded that father was not making progress quickly enough toward addressing his own mental-health issues and demonstrating the skills necessary to parent N.H. In contrast, the court found that N.H. was thriving and having all his needs met in his foster home. His foster parents, who had already adopted N.H.'s sibling, were willing to adopt N.H. as well.

The court ultimately concluded that father could not resume parental duties within a reasonable time and that termination of father's parental rights was in N.H.'s best interests.

On appeal, father argues that the evidence showed that he was making progress in meeting case-plan expectations, had not stagnated, and would be able to resume parenting within a reasonable time. When the termination of parental rights is sought after initial disposition, the trial court must conduct a two-step analysis. In re B.W., 162 Vt. 287, 291 (1994). The court must first find that there has been a change in circumstances, and second "that termination of parental rights is in the child's best interests." In re S.W., 2003 VT 90, ¶ 4, 176 Vt. 517 (mem.); see also 33 V.S.A. § 5113(b) (requiring court to find change in circumstances before modifying existing order). A change of circumstances is commonly demonstrated through parental stagnation, which occurs when "the parent has not made the progress expected in the plan of services for the family despite the passage of time." In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639 (mem.). In assessing the child's best interests, the family division is guided by the statutory criteria. 33 V.S.A. § 5114(a). The most important factor is whether the parent can resume parenting duties within a reasonable time. In re J.B., 167 Vt. 637, 639 (1998) (mem.). On appeal, we will uphold the family division's conclusions if supported by the findings and affirm the findings unless clearly erroneous. In re A.F., 160 Vt. 175, 178 (1993).

Although father points to evidence showing that he was making some progress toward some of the case-plan goals, there is ample evidence supporting the court's findings and conclusions. See id. at 181 ("[T]he mere fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of changed circumstances warranting modification of a previous disposition order."). The court credited father's efforts toward reunification, including maintaining regular visits with N.H. following his release from prison and beginning Family Time coaching, but the court remained concerned about other areas of father's progress. Contrary to father's suggestion that he was "patient and interacted well with [N.H.]" during visits, the court found, based on testimony from the DCF caseworker assigned to this case, that father's engagement with N.H. declined and father became more detached during visits, failing to understand and meet N.H.'s developmental, emotional, and physical needs. Father acknowledges on appeal his own troubling behavior during at least three supervised visits. This behavior included having a PTSD breakdown and becoming visibly agitated; causing a visit to end early; talking to himself; and not realizing that N.H. was in the room. He does not contest the court's finding that he has "struggled to use appropriate language with [N.H.] and to have appropriate expectations of him." Father also concedes that he did not complete a mental-health evaluation and has not regularly seen a therapist, as set forth in the case plan. Father's struggles with mental health, failure to engage in treatment to improve his mental health, lack of a parental relationship with N.H., and failure to demonstrate the ability to meet N.H.'s basic needs are all well-supported by the record and in turn support the court's stagnation and termination conclusions. To the extent father asks us to reweigh evidence or reassess the credibility of witnesses on appeal, we decline to do so. See In re S.B., 174 Vt. 427, 429 (2002) (mem.) (explaining that in termination of parental rights cases, "[o]ur role is not to second-guess the family court or to reweigh the evidence").

Father contends that the court gave him too little time in which to demonstrate progress, given that many of the case plan's action steps could not be completed until he was released from prison. We disagree. "The reasonableness of the time period is measured from the perspective of the child's needs and may take account of the child's young age or special needs." In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29 (citations omitted). Here, father did not meet N.H. until N.H. was seventeen months old. Father was responsible for that delay and the

consequences it had on his relationship with N.H.  See In re M.W., 2016 VT 28, ¶ 16, 201 Vt. 622 ("[O]ur case law makes clear that a parent is responsible for the behavior that leads to incarceration and for the consequences that come with such incarceration." (quotation omitted)). At the time of the termination hearings, N.H. was almost twenty-two months old, and had been in DCF custody since he was one day old.  Father had made little progress toward demonstrating the ability to meet N.H.'s needs—which are complex due to his fetal alcohol syndrome—and had never parented N.H.  In contrast, N.H. had been living with the same foster family for his entire life and was thriving there.  Given all these circumstances, the court appropriately assessed N.H.'s need for permanency, and it acted well within its discretion in concluding that father had stagnated and would not be able to parent N.H. within a reasonable period of time, and that termination of father's parental rights was in N.H.'s best interests.

Affirmed.

BY THE COURT:

_____
Harold E. Eaton, Jr., Associate Justice


_____
William D. Cohen, Associate Justice


_____
Nancy J. Waples, Associate Justice