VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.     25-AP-103

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## <u>ENTRY ORDER</u>

### AUGUST TERM,   2025

In re O.L., Juvenile
(W.H.-L., Father*)

}
}
}
}
}
}

APPEALED FROM:

Superior Court, Rutland Unit,
Family Division
CASE NO. 22-JV-01604
Trial Judge: Howard A. Kalfus

In the above-entitled cause, the Clerk will enter:

Father appeals the termination of his parental rights to O.L., who is nearly three years old.  We affirm.

O.L. was born in October 2022.  The State filed a petition shortly after O.L.'s birth alleging that he was a child in need of care or supervision (CHINS) due to mother's substance abuse during pregnancy and afterward.  The court issued emergency and temporary care orders placing O.L. in the custody of the Department for Children and Families (DCF).  Mother died in January 2023, shortly before the merits hearing.  In February 2023, the court issued an order finding by clear and convincing evidence that O.L. was CHINS.

In March 2023, father underwent genetic testing that confirmed he was O.L.'s parent.  In May 2023, the court granted the parties' stipulated motions to modify the temporary care order to provide for parent-child contact with father and for a protective order prohibiting father from accessing information about the foster family or contacting them and requiring visits with O.L. to be supervised.  The motion for a protective order stated that father was charged with two counts of aggravated domestic assault against mother and one count of illegal possession of a firearm based on allegations that in May 2022, he held a gun to mother's head and threatened to kill her and her unborn baby, O.L.[1]

Father attended the disposition hearing in May 2023.  The court issued a disposition order in June 2023 that adopted a goal of reunification with father by November 2023.  The disposition case plan called for father to, among other things: demonstrate an ability to supervise and meet O.L.'s developmental needs; obtain safe and stable housing; keep DCF informed of any intimate partners or household members; learn healthy and appropriate communication skills; engage in substance-abuse treatment; demonstrate sobriety; participate in a domestic-violence accountability program; communicate with DCF including signing releases; and not be charged with any additional crimes including violations of conditions of release.  Based on the parties'

---

[1] These charges were eventually dismissed due to mother's death.

stipulation, the court subsequently amended the permanency goal to reunification with father by February 2024.

In May 2024, DCF moved to extend the protective order requiring supervised visitation. The motion asserted that in June 2023 father was charged with misdemeanor possession of cocaine and in February 2024 he was charged with sexual assault and held without bail. The sexual assault charge was based on allegations that he had nonconsensual anal intercourse with his then-girlfriend while she was unconscious and videotaped the assault. The motion further asserted that father was struggling with his sobriety and had lost his housing. Father did not file an objection to the motion, which the court granted.

In September 2024, DCF filed a petition to terminate father's parental rights to O.L. and an amended case plan recommending a permanency goal of adoption. The court held a final hearing in February 2025, following which it issued an order granting the petition to terminate father's parental rights.

The court found that father was forty years old. He began abusing alcohol as a young adult and was convicted of driving under the influence twice in 2006 and 2007. He quit drinking alcohol after his second DUI conviction but began abusing substances in 2021. Shortly before his arrest in February 2024, he relapsed on cocaine and asked DCF for help in getting admitted to a residential treatment program. He was arrested on the sexual-assault charge before he could be admitted to treatment. At the time of the termination hearing, father had been held without bail on the sexual-assault charge—which carried a minimum penalty of three years and a potential maximum of life imprisonment—for a year. The case was scheduled for jury draw in March 2025. The court found that father's belief that he would be released shortly under a plea agreement or by acquittal was speculative. The court further found that father and mother were in an abusive relationship prior to her death and had each perpetrated violence against the other.

Prior to his incarceration in February 2024, father had consistently visited O.L. There were no concerns reported about his ability to parent O.L. during visits. He engaged with O.L. to help the child develop his verbal and motor skills. Father communicated with DCF and was making progress toward reunification, although he had not yet progressed to unsupervised visits. After father was incarcerated, he did not have contact with O.L. for nearly a year. He had a virtual visit with O.L. two days before the final termination hearing. The court found that the delay in setting up visitation was not attributable to father, but father was solely to blame for his incarceration.

During his incarceration, father engaged in some mental-health and substance-abuse counseling, AA meetings, a parenting group, a class to improve communication skills, a first-aid class that included a CPR component, and a course to be certified as a flagger. He planned to live with his ex-wife and their eight-year-old daughter upon his release from incarceration. His ex-wife's home was a safe and suitable place for O.L. to live.

O.L.'s lungs had not fully developed, making him susceptible to respiratory issues. He visited a pulmonologist every three months and required speech and physical therapy for other developmental issues. He had lived in the same foster home since entering DCF custody and was closely bonded to his foster family. They were able and willing to meet all his needs.

The court found that there had been a change in circumstances since disposition because father had stagnated in his progress toward reunification. Although father had been sober since his incarceration and demonstrated an understanding of O.L.'s medical and developmental needs,

he had almost no contact with O.L., who was two-and-a-half years old, for the previous year. Father had not progressed to unsupervised visits prior to his incarceration or engaged in adequate domestic-violence or mental-health treatment, which were necessary for O.L.'s safety. The court then weighed the statutory best-interests factors. The court found that O.L. was closely bonded to his foster family and community, that father was essentially a stranger to O.L. as a result of his incarceration, father was unable to assume a parental role within a reasonable time, and father loved O.L. but did not play a constructive role in his life. The court concluded that termination of father's parental rights was therefore in O.L.'s best interests. Father appealed.

Father first argues that the court made an insufficient inquiry into whether O.L. was an Indian child, as required by the Indian Child Welfare Act (ICWA). Father argues that the court was required to ask each participant "whether the participant knows or has reason to know that the child is an Indian child," 25 C.F.R. § 23.107(a), but in this case mother was asked only if she was a registered member of a tribe.

The ICWA defines an "Indian child" to mean "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). Mother's attorney asked her at the temporary care hearing whether she was "a registered member of an Indian or Pacific Islander or Aboriginal tribe?" She answered "No." There was no argument here that O.L. was a recognized member of an Indian tribe. Thus, the question asked of mother was sufficient to satisfy the ICWA, which requires an eligible child's biological parent to be a member of a tribe for the child to be considered an Indian child. Father points to no authority to support the notion that the court was required to ask mother about her tribal affiliation in a particular way. Nor does father claim that O.L. is an Indian child or that mother had Indian heritage, or that there was any other information in the record that would indicate O.L. had a tribal affiliation.[2] Under these circumstances, we see no error.

Father next argues that the court acted inconsistently with due process by not treating him as a party until disposition because it was aware that he was the putative father from the outset of the case. He argues that the delay in treating him as a party was prejudicial because it deprived him of the opportunity to participate in the merits hearing and valuable bonding time with O.L.

It is unclear whether father seeks to overturn the CHINS determination or other prior court orders. He did not object to or appeal from initial disposition, meaning that to the extent father seeks to collaterally challenge such orders, he must demonstrate that they are void. In re C.L.S., 2020 VT 1, ¶ 17, 211 Vt. 344. "[A] judgment is void only if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due process of law." Id. (quotation omitted).

Father has failed to demonstrate that the court deprived him of due process such that those orders, or the final order, were rendered void. "[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Brock v. Roadway Express, Inc., 481 U.S. 252, 261 (1987) (quotation omitted). The record does not support father's claim that the court unfairly excluded him as a party during the first months of the case. A "party" for purposes of a CHINS proceeding includes "the custodial parent, the guardian, or the custodian of the child in all instances except a hearing on the merits of a

---

[2] At a hearing, father indicated through his attorney that he was not a registered member of a recognized tribe and had no reason to believe that he had Native American heritage.

delinquency petition," and "the noncustodial parent for the purposes of custody, visitation, and such other issues that the court may determine are proper and necessary to the proceedings, provided that the noncustodial parent has entered an appearance." 33 V.S.A. § 5102(22). At the time the CHINS petition was filed, O.L. was in the hospital, where he had been since birth. Father's address was unknown and he points to no evidence that he was the custodial parent at the time of the petition. He did not assert that he was a party in the case prior to May 2023. While he faults the court for not asking the parties about whether he had executed a voluntary acknowledgment of parentage, he does not claim to have actually done so and O.L.'s birth certificate did not list him as the father. It was therefore appropriate for the court not to treat him as a party until parentage was confirmed.

Moreover, the delay in confirming parentage was attributable, at least in part, to father. The record shows that DCF attempted to schedule genetic testing for father multiple times. He missed appointments in December 2022 and January 2023 and did not complete the testing until March 2023. He finally entered an appearance in the case in May 2023, after he was confirmed to be O.L.'s biological father. At that point he was granted parent-child contact; he also participated in the disposition hearing and had the opportunity to contest the case plan. This record does not support father's claim that he was deprived of due process such that the CHINS determination or any other order in the case is void.

Father asserts that his absence from the CHINS merits hearing meant that the petition was unopposed, resulting in findings that were "highly prejudicial" to him. It is unclear what father is referring to. The court concluded that O.L. was CHINS at the time of the petition based on findings that he was born prematurely with drugs in his system; mother had been unable to provide clean urinalysis to be able to breastfeed him while he was in the hospital; mother appeared to be actively using substances; and mother often left O.L. in the care of the hospital without notifying them she was leaving or how long she would be away and whether she had fed O.L. The only finding regarding father was that mother had met with him in violation of both parents' conditions of release. These findings, which are focused almost entirely on mother's behavior and are essentially neutral as to father, supported the court's determination that O.L. was CHINS at the time of the petition. Father does not explain what evidence he would have presented or how his participation would have affected the outcome of the CHINS merits hearing.

Father next argues that the evidence did not support the court's finding of stagnation or its conclusion that he was unable to assume a parental role within a reasonable time. When considering a petition to terminate parental rights after initial disposition, the family court must first determine whether there has been a change in circumstances sufficient to justify modification of the original disposition order. In re B.W., 162 Vt. 287, 291 (1994). "A change in circumstances is most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." In re H.A., 153 Vt. 504, 515 (1990). If it finds a change in circumstances, the court must then consider whether termination is in the child's best interests in accordance with the factors set forth in 33 V.S.A. § 5114(a). "The most important factor for the court to consider is the likelihood that the parent will be able to resume parental duties within a reasonable time." In re J.B., 167 Vt. 637, 639 (1998) (mem.). "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450 (quotation omitted).

4

Father claims that his stagnation was caused by a factor outside his control, namely, DCF's delay in arranging visitation with O.L. while he was incarcerated. This claim lacks merit. As the trial court found, father was solely to blame for the criminal behavior that led to his incarceration, which necessarily limited visitation. See In re D.S., 2014 VT 38, ¶ 20, 196 Vt. 325 (explaining that father was "solely responsible for the criminal behavior that led to his incarceration and to the imposition of conditions limiting his contact" with child). Furthermore, even before he was incarcerated, father had not progressed to unsupervised visits with O.L. or engaged in adequate domestic violence or mental health treatment to address the issues raised at disposition. These factors were sufficient to support the court's finding of changed circumstances, despite father's progress in other aspects of the case plan. See In re A.F., 160 Vt. 175, 181 (1993) ("[T]he mere fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of changed circumstances warranting modification of a previous disposition order.").

Father further argues that the court erred in concluding that he would not be able to assume parental duties within a reasonable time. Father argues that the court accepted his estimate that he would be released from incarceration within three months, which was a relatively short amount of time compared to the case as a whole. Father misconstrues the court's decision. The court stated that father believed he would be released from incarceration by acquittal or plea agreement within three months. The court stated, "[a]lthough this may be a realistic expectation, it is speculative." It explained that even if father were released, he would still have to complete the action steps related to domestic violence and mental health before reunification could occur. It found that from O.L.'s perspective, even three more months was not a reasonable time to begin the reunification process. The court's findings are supported by the record and in turn support its conclusions as to O.L.'s best interests, including that father would not be able to resume parenting within a reasonable time. See In re M.W., 2016 VT 28, ¶ 23, 201 Vt. 622 (upholding termination order based on findings that father was never primary caregiver; father had been incarcerated for two years, since child was three years old, and was now unknown to child; length of father's incarceration was uncertain; and even if released, reunification would take significant amount of additional time).

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
Nancy J. Waples, Associate Justice

5