VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.        25-AP-421



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

# ENTRY ORDER

MAY TERM,   2026

| | |
|---|---|
| In re C.W., Juvenile<br>(B.W., Mother* and C.W., Father*) | APPEALED FROM:<br><br>Superior Court, Washington Unit,<br>Family Division<br>CASE NO. 22-JV-00678<br>Trial Judge: Kirstin Schoonover |

In the above-entitled cause, the Clerk will enter:

Parents appeal the termination of their parental rights to six-year-old C.W.  We affirm.

C.W. was born in January 2020.  In May 2022, the State filed a petition alleging that C.W. was a child in need of care or supervision (CHINS) after C.W.'s seven-month-old brother died of a drug overdose while in parents' custody.  The court transferred custody of C.W. to the Department for Children and Families (DCF).

In December 2022, the parties stipulated that their daughter C.W. was CHINS at the time of the petition because parents both had substance-abuse disorders and relapsed; as a result, parents had not provided age-appropriate supervision for their children; their infant son died by a mixed drug overdose while in mother's care; and as a result, C.W. was at risk of harm. Concurrently with the merits determination, the court issued a disposition order continuing DCF custody and establishing a permanency goal of reunification with one or both parents by April to May 2023.  The case plan adopted by the court required parents to "demonstrat[e] the ability to provide safe and predictable caregiving in a violence and substance free home."  The plan called for parents to: engage in substance-use treatment and follow provider recommendations; demonstrate long-term sobriety; maintain safe and appropriate housing; ensure C.W. was not exposed to domestic conflict; ensure C.W. was not exposed to unsafe people; attend C.W.'s appointments and follow provider recommendations; engage in Family Time Coaching; and meet all expectations of the criminal court and probation and parole.  The court subsequently amended the permanency goal to provide for reunification by September 2023.

In August 2023, the court issued a conditional custody order (CCO) to parents.  After a hearing in February 2024, the court granted the State's motion to continue the CCO for an

additional six months, which would have extended it to the end of August 2024. The following day, the State moved to modify the CCO to make mother sole custodian because father had abruptly moved to Illinois to be with another woman. By the time of the March 2024 hearing on the motion, father had moved back to Vermont and reunited with mother. The court issued an order extending the CCO to both parents for another six months, or until the end of September 2024.

In early September 2024, the State moved to modify disposition to place C.W. in DCF custody after C.W. was injured during an altercation between mother and father. The court granted an emergency care order transferring custody to DCF. In a subsequent temporary care order, the court found that father had physically assaulted mother and C.W. at the hotel where they had been living for several months. Father was smoking crack cocaine and went "crazy," injuring both mother and C.W. The court continued custody with DCF and scheduled a disposition hearing for March 2025. Prior to that hearing, the State filed a petition to terminate parents' residual rights to C.W. as well as an updated case plan.

The court held a hearing on the termination petition over two days in September and November 2025. It issued a written order making the following findings by clear and convincing evidence.

Parents were charged with manslaughter for the overdose death of their infant son. In January 2024, parents pled guilty and were ordered to serve one-to-fifteen years, all suspended with probation.

Parents initially engaged with the action steps in the case plan and cooperated with DCF. They attended substance-abuse treatment and maintained a safe home. They were successful in implementing parenting strategies during Family Time Coaching, which eventually transitioned into their home. The court granted them conditional custody in August 2023.

In April 2024, parents, who had been served with a no-cause eviction complaint, left their apartment and moved into a motel in Colchester. After they moved, mother gave premature birth to another child, who died shortly after birth.

On September 5, 2024, father physically assaulted mother, injuring her and C.W. Mother did not disclose father's assault to DCF. She was evicted from the hotel room and moved in with a male friend for approximately eight months. Mother did not seek a restraining order against father. Immediately after the incident, mother told her probation officer that father had assaulted her, but she later minimized his behavior.

Parents testified that mother was the aggressor in the September 2024 incident. Father denied that he assaulted mother, harmed C.W., or used illegal substances. Mother testified that she had used cocaine but said she obtained it from another resident at the hotel, rather than from father as she had originally stated. Parents testified that the blood strewn around the room was from a cut on mother's finger and her vaginal bleeding.

The police officer who responded to the incident testified that he saw father's car leaving the hotel when he arrived. Mother was hysterical and bleeding and there was blood splattered all over the hotel room. Mother told the officer that she and father were fighting over drugs and father assaulted her. Father pinned her to the ground and strangled her. C.W. hit father and father flung the child away. The officer observed a deep cut on mother's finger and several cuts

2

above her right eye and forehead. Blood from the cut over her eye was dripping into her hair. C.W. also had abrasions on her shoulder, ribcage and back. C.W. told the officer to arrest father. Father later turned himself in to law enforcement. He was released in February 2025 when mother recanted her initial statement.

After the incident, C.W. often spoke of the assault to her foster family, saying that father had punched mother, that father threw C.W. into a coffee table, and that she and her mother tried to hide in the bathroom. Over time, C.W.'s story changed. She said that she protected her mother and put her in the bathroom and punched father. Father asserted that C.W.'s statements, including her statement that "Daddy needs to go to jail," were in reference to the game "cops and robbers."

The court did not find parents credible in their testimony about the assault. The court found that mother could not have physically overpowered father, who was larger and stronger than mother. The court also observed that mother's initial statements to police and others were consistent and explained C.W.'s injuries, and father's testimony did not explain mother's physical injuries.

Both parents were charged with violating their probation conditions after the September 2024 incident. In February 2025, father admitted to violating his probation conditions by engaging in criminal behavior and received a probationary sentence.

After September 2024, mother had visits with C.W. three times a week. The visit schedule was reduced to twice a week for ninety minutes once C.W. started school in September 2025. Mother often left visits early or missed them entirely due to car problems, her need to pick up father from work, or conflicts with her work schedule. DCF offered to work with mother's employer to facilitate visits, but mother was highly distrustful of the DCF caseworker and refused help. C.W. became distraught and dysregulated when mother left visits early. After mother left a visit early in July 2025, C.W. cried, had a tantrum, and was physically aggressive. During that month, the foster mother repeatedly had to pick C.W. up early from daycare due to her behaviors, which included punching a friend and slapping another person.

Mother attended two visits in July 2025 and two in August. In the fall of 2025, she attended only half of her scheduled visits. C.W. told her foster mother in August 2025 that she no longer wanted to see mother. DCF later allowed mother to bring C.W.'s half-sisters to a visit, which C.W. enjoyed and helped overcome her reluctance.

DCF did not resume visitation with father after he was released because C.W. reported being afraid of him. C.W. has not seen father since September 2024. Father did not acknowledge his abuse, although he stated he knew that C.W. was traumatized by the death of her brother and by witnessing the physical altercation in the hotel room.

After father was released from incarceration in February 2025, he was involved in a bar fight in Barre, where he and mother were drinking and celebrating his release from jail. Mother tried to restrain him from hitting others but was unable to do so. Father was incarcerated until May 2025. He admitted to a violation of probation and simple assault. Father participated in Alcoholics Anonymous at the jail but did not take anger-management classes because he believed his issues were limited to heroin addiction.

3

Father had a previous conviction for assaulting someone at a bar ten years previously. He had criminal charges in Massachusetts for arguing with the mother of his other child. He was also arrested for sexual assault against a "high school sweetheart," although the charges were dropped.

In the summer of 2025, parents moved into an apartment in Winooski. DCF was not aware of their new address until they disclosed it at the hearing. Parents engaged in marriage counseling, and according to father, their relationship was "healed." Father also started counseling in May 2025 with Better Life Partners. His counseling dealt with emotional trauma and anxiety and had an anger-management component. He did not engage in domestic-violence counseling because it was not required by his conditions. Mother attended substance-abuse counseling in St. Albans. Mother had not used cocaine since September 2024. Both parents believed they were ready to parent C.W. and blamed DCF for the lack of progress in reunification.

The court found that parents had complied with many of the action steps in the case plan. They had housing, were both working, and were sober. However, they had not complied with the underlying goal of providing C.W. with safe and predictable caregiving in a violence- and substance-free home. The court found that parents were using substances when the September 2024 assault occurred. Parents also had not confronted father's pattern of violence. Father refused to take responsibility for his actions and blamed others for the assault and C.W.'s reluctance to see him. Both parents "cl[ung] to a fiction that mother, not [father], [was] the aggressor in the relationship." Mother was determined to remain with father and therefore could not protect C.W. from potential harm. The court therefore concluded that there had been a substantial change in circumstances sufficient to justify modifying the existing disposition order.

The court then assessed the best-interests factors in 33 V.S.A. § 5114(a). The court found that parents loved C.W. and she loved them. However, her relationship with father had weakened since the September 2024 incident and she was afraid of him. Her relationship with mother was stronger but had also suffered due to mother's missed and inconsistent visits. C.W. now looked to her foster mother for comfort. She was closely bonded with her foster family. She was also well-adjusted to her foster home, school, and community. The court found that parents would not be able to resume parental duties within a reasonable time. They had made some progress but their "inability to address the very real trauma that mother and [C.W.] endured in September 2024 has effectively derailed this case." Parents were not honest with themselves or DCF about that incident. They had not addressed father's potential for domestic violence, and therefore could not provide a stable and violence-free home for C.W. Finally, the court found that parents did not play a constructive role in C.W.'s life. It therefore concluded that termination was in C.W.'s best interests. Both parents appealed.

We begin by addressing father's claim that the court committed reversible error by not requiring the State to file a new CHINS petition, and not holding a new merits hearing, after it issued the September 2024 emergency care order. At no point during the fourteen months that elapsed between the emergency care order and the termination order did father argue to the family court that such a procedure was required. We have consistently rejected claims of procedural error by parents on appeal that were not raised before the family court, even when those claims involved alleged constitutional violations. See In re M.P., 2019 VT 69, ¶ 12, 211 Vt. 20 (concluding in appeal from termination that parents failed to preserve argument that CHINS merits stipulation was invalid because mother's husband, although the putative father

4

and custodial parent at the time, lacked authority to stipulate that M.P. was CHINS and mother did not sign); In re C.H., 170 Vt. 603, 604 (2000) (mem.) (declining to reach father's argument that family court erred in terminating rights because his parental rights could not constitutionally or statutorily be terminated without a finding that he is an unfit parent, because father never raised it below). The "purpose of the preservation rule is to ensure that the original forum is given an opportunity to rule on an issue prior to our review," and to correct errors if necessary. In re White, 172 Vt. 335, 343 (2001). Having failed to raise his procedural claim below, father has not preserved it for our review.[*]

We therefore turn to parents' challenges to the merits of the termination decision. When considering a petition to terminate parental rights after initial disposition, the family court must first determine whether there has been a change in circumstances sufficient to justify modification of the original disposition order. In re B.W., 162 Vt. 287, 291 (1994). "A change in circumstances is most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." In re H.A., 153 Vt. 504, 515 (1990). If it finds a change in circumstances, the court must then consider whether termination is in the child's best interests in accordance with the factors set forth in 33 V.S.A. § 5114(a). "The most important factor for the court to consider is the likelihood that the parent will be able to resume parental duties within a reasonable time." In re J.B., 167 Vt. 637, 639 (1998) (mem.). "The State has the burden of proof at both stages and, as to each point, must meet its burden by clear and convincing evidence." In re R.W., 2011 VT 124, ¶ 15, 191 Vt. 108 (quotation omitted). "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450.

Father first argues that the court's findings that he assaulted mother and injured C.W. were not supported by clear and convincing evidence because they were based on hearsay. "Hearsay evidence is admissible in termination proceedings as long as it is not the sole basis for termination of parental rights." In re A.F., 160 Vt. 175, 181 (1993); see 33 V.S.A. § 5317(b)

---

[*] Father argues that the error was plain and therefore may be addressed by this Court. We disagree; father urges a novel interpretation of the statute, and any error is accordingly not obvious. See State v. Gilbert, 2009 VT 7, ¶ 7, 185 Vt. 602 (mem.) (holding error not plain where Court had not yet decided issue raised by defendant for first time on appeal, and thus "defendant [could not] show that any error of law the trial court may have made was obvious"). Even if plain error applied, it would not exist in this case because this case does not present exceptional circumstances where failure to recognize error would result in a miscarriage of justice, or be so glaring as to deprive a litigant of constitutional rights. In re Carter, 2004 VT 21, ¶ 21, 176 Vt. 322. Father was afforded ample opportunity to challenge the removal of C.W. following the September 2024 altercation, including at the September 12, 2024 hearing, as well as at the 2025 termination hearings. Father also could have appealed the September 2024 modification order. In re I.B., 2016 VT 70, ¶ 9, 202 Vt. 311 (holding that court's order granting motion to transfer custody of child to DCF, although erroneously styled as temporary care order, was modification of disposition order appealable under 33 V.S.A. § 5318(d)). We also decline to address father's facial challenge to the constitutionality of the CHINS statute, which he raises for the first time in his reply brief. See State v. Lizotte, 2018 VT 92, ¶ 16 n.4, 208 Vt. 240 (refusing to address constitutional argument raised for first time in reply brief); Gallipo v. City of Rutland, 2005 VT 83, ¶ 52, 178 Vt. 244 (explaining that issues raised for first time in reply brief are unpreserved and this Court will not address them).

(stating that at disposition hearing, "[h]earsay may be admitted and may be relied on to the extent of its probative value"). Here, the court's findings that mother consistently told people at the time of the incident that father had assaulted her, and that C.W. was injured during the incident, are supported by nonhearsay evidence. Mother testified that on the night of the incident, she told her friend and the responding police officer "the truth," which is that father "beat me up." She acknowledged that she initially told police and the court that father had pressured her to smoke crack cocaine with him and assaulted her, although she claimed that she lied because she was upset about father communicating with another woman. Mother's testimony about her original statements was corroborated by the police officer, who testified that mother told him at the scene that father assaulted her twice, dragged her on the floor, and flung C.W. away from him when C.W. tried to intervene. The officer personally observed that mother was cut and bleeding, that there were bloodstains on and outside the doorway and blood droplets scattered "extensively on the floor" as well as on the bathroom countertop, a phone, and some clothing, and that C.W. had abrasions on her shoulder, rib cage, and back. This evidence was sufficient to support the court's findings, and it was corroborated by the hearsay evidence that was admitted without objection. Furthermore, father admitted that he was larger and stronger than mother, and mother testified that she was unable to hold him back from fighting during the later bar fight; this evidence undercut their claim that mother was the one who assaulted father and kept him from leaving the hotel room. The existence of minor inconsistencies in the witnesses' testimony or conflicting evidence does not render the court's findings clearly erroneous. See In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325 ("We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." (quotation omitted)); Fournier v. Fournier, 169 Vt. 600, 603 (1999) (mem.) ("The discretion to assess witness credibility includes the authority to reject some but not all of a witness's testimony.").

Father further argues that the court's finding that C.W. was scared of father was based on unreliable hearsay testimony from C.W.'s foster mother and a DCF caseworker. We have specifically held in a termination proceeding that "even uncorroborated hearsay evidence may support a factual finding if admitted without objection." In re M.P., 133 Vt. 144, 146 (1975). Thus, when "a party seeks to exclude hearsay evidence from the court's consideration in a disposition hearing, the party must make its objection known to the court." In re R.L., 148 Vt. 223, 228 (1987). Neither parent objected to the statements about C.W.'s fear of father at the hearing; accordingly, they have not preserved this claim of error for our review. Id. (holding "parents' failure to object to the introduction of hearsay at the disposition hearing served as a waiver of their claim that its use at that hearing was error").

Next, father claims that the court erred in concluding that a single incident of domestic violence justified cutting off father's parent-child contact, which led to termination of father's rights. The CHINS statute expressly authorizes the court to suspend parent-child contact while the child is in DCF custody if "necessary . . . [for] the protection of the physical safety or emotional well-being of the child." 33 V.S.A. § 5319(a). Here, however, the court ordered in the September 2024 temporary care order that parent-child contact would take place as agreed to between father and DCF. Father argues that the court should not have allowed DCF to unilaterally suspend contact without finding him to be unfit. In essence, he argues that his lack of contact and the resulting lack of a bond with C.W. was the fault of DCF.

The record shows that from September 2024 to February 2025, father was incarcerated and his criminal conditions prohibited him from contacting C.W. After father's release, DCF did

6

not arrange to resume visitation because C.W. had repeatedly said that she was afraid of father. In February 2025, father asked the court to order DCF to resume contact, but by the time of the hearing on his motion, father had been reincarcerated for the Barre assault and his attorney agreed to withdraw the motion. Father did not subsequently seek to reinstate parent-child contact. Father's criminal behavior, resulting incarceration and criminal conditions, and subsequent failure to renew his motion to resume contact were matters within his control and cannot be attributed to DCF. See In re D.S., 2014 VT 38, ¶ 26, 196 Vt. 325 ("[O]ur case law makes clear that a parent is responsible for the behavior that leads to incarceration and for the consequences that come with such incarceration.").

Finally, father argues that the court erred by elevating the best interests of the child over the fundamental right of the family to remain intact without explicitly finding parental unfitness, which he argues is required under Santosky v. Kramer, 455 U.S. 745 (1982). We rejected a similar argument in In re D.C., 2012 VT 108, 193 Vt. 101. We explained that Santosky addressed only the standard of proof required by due process for terminating parental rights. Id. ¶ 21. "Although [Santosky] spoke in terms of proving parental 'unfitness' in noting the specific state statutory criteria for determining whether a parent was capable of parenting a child, it did not purport to address the issue of what substantive showing was required to terminate parental rights." Id. (emphasis added). We explained that in Vermont, "unfitness" is measured by the best-interests criteria set forth in 33 V.S.A. § 5114(a), "which encompass both directly and indirectly the question of parental fitness." Id. ¶ 22.

Here, the family court applied the best-interests criteria and thus necessarily considered father's fitness to parent C.W. The court's findings support its conclusions. The court found that father's bond with C.W. had weakened due to his absence from her life and her fear of him arising from the September 2024 incident. He provided no emotional or other support for her. Because he had not accepted responsibility for his actions or taken any steps to address his pattern of violent behavior, which recurred as recently as March 2025, he could not provide her with a safe home free of violence within a reasonable time. These findings are supported by the evidence and in turn support the court's conclusion. While father argues that the court should have given greater weight to his right to parent, it is well-settled that parental rights "are not absolute and may be overcome when the child's best interests require it." In re M.W., 2016 VT 28, ¶ 19, 201 Vt. 622; see In re M.B., 162 Vt. 229, 238 (1994) ("Public policy . . . does not dictate that the parent-child bond be maintained regardless of the cost to the child; [the CHINS statute] recognizes that severance of that bond may be in the child's best interest.").

Similarly, the evidence supports the court's findings that mother stagnated in her progress and would not be able to resume parenting within a reasonable time. As we have often observed, the "fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of changed circumstances warranting modification of a previous disposition order." In re A.F., 160 Vt. 175, 181 (1993). The court acknowledged that by the time of the termination hearing, mother had obtained housing and employment, was engaged in counseling, and appeared to have been sober for a sustained period. However, mother was not honest about father's violence and appeared to prioritize her relationship with him over the safety of C.W. The court did not blame mother for being a victim, as she asserts. Rather, it reasonably concluded that without admitting to and addressing the pattern of previous violence, mother could not provide a safe and violence-free home for C.W.; in other words, she had not mitigated one of the major issues that led to C.W. entering state custody in the first place. Moreover, mother had failed to consistently visit C.W. or to progress beyond supervised visits during the

7

fourteen months since custody was transferred to DCF in September 2024. This had weakened her relationship with C.W., who no longer trusted mother. These findings supported the court's conclusion that mother would not be able to resume parenting C.W. within a reasonable time from the child's perspective.

Affirmed.

BY THE COURT:

Harold E. Eaton, Jr., Associate Justice

Christina E. Nolan, Associate Justice

Michael P. Drescher, Associate Justice